CATHERINE P. SACK, Appellant and Cross-Respondent, v. RICKEY RANDELL TOMLIN, Respondent and Cross-Appellant.

No. 23856

March 30, 1994            871 P.2d 298

*Julian C. Smith, Jr.,* Carson City, for Appellant and Cross-Respondent.

*Robert A. Grayson,* Carson City, for Respondent and Cross-Appellant.

## OPINION

*Per Curiam:*

Appellant Catherine P. Sack (Cathy) and respondent Rickey Randell Tomlin (Rickey) commenced living together in March of 1984. Six months later Cathy obtained a divorce from her husband, William Sack (William). Pursuant to the divorce decree, Cathy received fee simple ownership to a house in Carson City, Nevada. In exchange, Cathy gave William a lump sum promissory note, in the amount of $43,082.00, due and payable on September 30, 1990. As the due date on the promissory note drew closer, Cathy contemplated her two viable alternatives: refinance or sell the house. After discussing the matter with Rickey, they collectively decided to refinance. On May 10, 1990, Cathy conveyed the house to herself and Rickey as tenants in common. Together, they obtained a new loan for the house in the amount of $126,000.00.

Eventually, differences arose between them and Rickey moved out of the house in late February, 1991. Rickey continued to make one-half mortgage contributions through October, 1991. The house was sold in April, 1992. Cathy made the final five mortgage payments entirely by herself. Thereafter, a dispute arose over the apportionment of the proceeds from the sale of the house. Applying the doctrine of quantum meruit, the district court concluded that Rickey had bought-in to 18% of the house's equity and it ordered the proceeds apportioned accordingly. It also denied Cathy's request for contribution towards mortgage payments and denied Rickey's request for attorney's fees. Both parties appealed the district court's order.

For reasons stated hereafter, the district court's denial of respondent's request for attorney's fees is affirmed. In addition, appellant is entitled to contribution for one-half of the last five

mortgage payments that she made alone. Further, the district court's apportionment of the sale of the house is modified and remanded for action consistent with this opinion.

## FACTS

Cathy and Rickey began living together in March of 1984, in a house (the house) located at 1510 Valencia Court, Carson City, Nevada.[1] At the time, Cathy was separated from her husband with whom she owned the house in joint tenancy.[2] Pursuant to a September 14, 1984, divorce decree, the house was transferred to Cathy, thus vesting in Cathy full fee simple ownership.[3]

As the maturity date on the promissory note to William drew closer, Cathy contemplated her two viable alternatives: refinance or sell the house. After discussing the matter with Rickey, they collectively decided to refinance the house. On May 10, 1990, Cathy conveyed the house to herself and Rickey as tenants in common. Together, they obtained a new loan for the house in the amount of $126,000.00. The outstanding promissory notes to First Interstate Bank and William were retired.[4]

In late February, 1991, Rickey moved out of the house after differences arose between him and Cathy. Following the separation and through October, 1991, Rickey continued to make one-half of the mortgage payment due each month. In November, 1991, the house was listed for sale.[5] Five months later, the house was sold for $185,000.00, leaving a net equity of $46,278.00. The dispute concerns the ownership of this equity interest.

---

[1]Over the next 84 months, Cathy and Rickey resided together and they made separate and unequal contributions towards their combined living expenses. Under this arrangement they maintained a higher standard of living than they could have maintained individually.

[2]Cathy and her husband, William C. Sack, acquired this house on November 10, 1977, for $88,000.00.

[3]Cathy became vested with full fee simple ownership subject to a first deed of trust, which secured a promissory note in favor of First Interstate Bank of Nevada, for $42,951.00; and a second deed of trust, which secured a promissory note in favor of William for $43,082.00. The promissory note to William was due and payable in one lump sum on September 30, 1990. For property settlement purposes, the district court appraised the value of the house at $150,000.00, on September 14, 1984.

[4]The promissory note to William was for $43,082.00. However, by May 10, 1990, interest accumulations brought the principal balance on the note to $72,500.00. In addition, the $39,782.00 promissory note to First Interstate Bank was retired. The remaining $13,718.00 borrowed on the new mortgage was spent by the parties on vacations, home improvements, and personal items.

[5]From November, 1991, through March, 1992, Rickey did not make a contribution towards the mortgage payment.

Cathy contends that the May, 1990, conveyance of the house to herself and Rickey as tenants in common was not intended to transfer to Rickey any of the equity that Cathy had accumulated from 1977 to 1990; instead, it was only intended to transfer an equal portion of the future appreciation of the house.[6] Conversely, Rickey contends that he is entitled to one-half of the equity by virtue of the grant, bargain and sale deed conveying the house to him as a tenant in common.

The district court concluded that Cathy did not intend to make a gift to Rickey of one-half of her accumulated equity. However, the district court noted that Rickey contributed 36% of the funds applied towards the total expenditures of both parties during the period of cohabitation.[7] Applying the doctrine of quantum meruit, the district court determined that Rickey was essentially buying-in to one-half of Cathy's equity, and awarded Rickey 18% of the total net equity from the sale of the house, or $8,330.04. This left Cathy $37,947.96 of the net equity.

## LEGAL DISCUSSION

*Whether the district court erred in applying the doctrine of quantum meruit to the apportionment of the proceeds from the sale of the house.*

Both appellant and respondent assert that the district court erroneously applied the doctrine of quantum meruit to the facts in this case. The doctrine of quantum meruit generally applies to an action for restitution involving work and labor performed which is founded on a oral promise on the part of the defendant to pay the plaintiff as much as the plaintiff reasonably deserves for his labor in the absence of an agreed upon amount. *See, e.g.,* Herman v. Blase, 77 Nev. 127, 359 P.2d 745 (1961); United Tungsten v. Corp. Svc., 76 Nev. 329, 353 P.2d 452 (1960).

This court has previously addressed the doctrine of quantum

---

[6]Cathy and Rickey prepared separate loan applications for the May, 1990, mortgage. Cathy's loan application lists the house as an asset, with a value of $170,000.00. Rickey's loan application indicates that he had no ownership interest in the house.

[7]The district court does not indicate how it calculated the 36% contribution. Bank statements show that during the period of cohabitation (1984-1991) that Cathy contributed $164,789.00 (71.46%) and Rickey contributed $65,802.00 (28.54%) towards total joint living expenses of $230,591.00. Cathy's contributions amount to 84.46% of her total income of $195,118.00, while Rickey's contributions amount to 30.55% of his total imcome of $215,407.00.

meruit in the context of property rights of unmarried cohabitants. Hay v. Hay, 100 Nev. 196, 678 P.2d 672 (1984); Warren v. Warren, 94 Nev. 309, 579 P.2d 772 (1978). In *Hay,* this court stated:

> "The courts should enforce express contracts between nonmarital partners except to the extent that the contract is explicitly founded on the consideration of meretricious sexual services . . . In the absence of an express contract, the courts should inquire into the conduct of the parties to determine whether that conduct demonstrates an implied contract, agreement of partnership or joint venture, or some other tacit understanding between the parties. The courts may also employ the doctrine of *quantum meruit,* or equitable remedies such as constructive or resulting trusts, when warranted by the facts of the case."

*Hay,* 100 Nev. at 199, 678 P.2d at 674 (quoting Marvin v. Marvin, 557 P.2d 106, 122-23 (Cal. 1976)).

In *Marvin,* the California Supreme Court held that "a nonmarital partner may recover in quantum meruit for the reasonable value of household services rendered less the reasonable value of support received if he can show that he rendered services with the expectation of monetary reward." *Marvin,* 557 P.2d at 122-23.

In the instant case, the district court did not find an expressed or tacit agreement between the parties to compensate one another for household services. Instead, the district court based its apportionment of the net equity of the house solely on the cash contributions made by each party towards their total living expenses during the period of cohabitation. There is nothing in the record which indicates that either party promised or expected compensation for their contribution of household services. Nor is there any evidence in the record to indicate that whatever services were provided by one party were not reduced by equivalent services rendered by the other party. In addition, recovery for household services was not an issue before the district court. Under *Marvin* and *Hay,* the doctrine of quantum meruit does not apply to the factual circumstances in the instant case.

*Whether the proceeds should have been apportioned pursuant to the doctrine of contribution.*

Cathy and Rickey lived together under circumstances of mutual convenience. Each was able to enjoy a lifestyle and standard of living that neither could afford individually. They did not, however, hold themselves out to be husband and wife. There was no written income pooling agreement between the parties. The

record reflects that there was conflicting testimony regarding the expectations of Rickey's contributions to household expenses. Rickey characterizes his contributions as pooling of income. Cathy characterizes Rickey's contributions as payment for rent and a fair share of the household expenses. Rickey testified that the rental value of Cathy's home, at least to him, was $700.00 in 1984 and $1,500.00 in 1992. During this period, Rickey contributed an average of $783.00 per month.[8] During that same period, Cathy contributed an average of $1,962.00 per month.[9] Consequently, Cathy considers Rickey's contributions as a quid pro quo for lodging and meals.

The community property apportionment method enunciated by this court in Malmquist v. Malmquist, 106 Nev. 231, 792 P.2d 372 (1990), is not applicable to the instant case because: these parties were not married, nor did they hold themselves out as being married; no community property was ever held by the parties and they purposely held title to the house as tenants in common.[10] Accordingly, the apportionment dispute in the instant case is more analogous to those instances where cotenants unequally contribute to the purchase price of real property.

Many cases have held that where cotenants unequally contribute to the purchase price of real property, that a presumption arises that the cotenants intended to share in proportion to the amount contributed by each to the purchase price. *See* Williams v. Monzingo, 16 N.W.2d 619 (Iowa 1944); *see also* Milian v. DeLeon, 226 Cal.Rptr. 831 (Cal.Ct.App. 1986); Cummings v. Andersen, 590 P.2d 1287 (Wash.Ct.App. 1979); *cf.* Kershman v. Kershman, 13 Cal.Rptr. 290 (Cal.Ct.App. 1961); Moran v. Thomas, 117 N.Y.S. 190 (N.Y.App.Div. 1952). The courts have also held that in the absence of an agreement between two unmarried parties living together to pool their incomes and share equally in joint accumulations, each party is entitled to share in the property jointly accumulated in the proportion that his or her funds contributed towards the acquisition. Beckman v. Mayhew,

---

[8]Rickey's total contributions were $65,802.00 ($65,802.00 ÷ 84 months = $783.00 per month).

[9]Cathy's total contributions were $164,789.00 ($164,789.00 ÷ 84 months = $1,962.00 per month).

[10]The new mortgage loan application prepared by First Interstate Bank for Cathy and Rickey initially indicated that the house would be held in joint tenancy. However, Cathy insisted that title be held as tenants in common because she wanted the equity that she had accumulated between 1977 and 1990 to inure to the benefit of her survivors. Rickey acquiesced, and initialled the change to how title would be held.

122 Cal.Rptr. 604 (Cal.Ct.App. 1975); Barlow v. Collins, 333 P.2d 64 (Cal.Ct.App. 1958); Hill v. Estate of Westbrooke, 213 P.2d 277 (Cal.Ct.App. 1950); *see also* Valera v. Valera, 134 P.2d 761 (Cal. 1943); *cf.* Keller v. Porchey, 560 S.W.2d 257 (Mo. Ct.App. 1977) (where title is conveyed to unmarried cohabitants as husband and wife, the property is to be apportioned on the basis of contribution).

In *Kershman,* the court described its approach to situations where cotenants[11] contribute unequally to the purchase price of real property:

> The proper approach would be to first determine the respective ownership interests of the parties whether equal or otherwise. Upon sale of the property there should be a determination of the share of each in the net proceeds according to those interests. Then any claims that one party may have against the other should be deducted from the share of the party to be charged and that of the other party should be increased accordingly.

*Kershman,* 13 Cal.Rptr. at 294. Under the *Kershman* formula, Rickey and Cathy would respectively have 63/170 and 107/170 interests in the house.[12]

The net proceeds from the sale of the house were $172,715.63. Applying the *Kershman* formula, Rickey would receive $787.60, and Cathy would receive $45,490.46.[13] This result is consistent

---

[11]In Kershman v. Kershman, 13 Cal.Rptr. 290 (Cal.Ct.App. 1961), the parties were joint tenants who made unequal contributions towards the purchase of real property.

[12]The record only reflects the source of funds deposited into Cathy's bank account, i.e., Rickey or Cathy. The record does not reflect, however, how those funds were applied. For instance, from March of 1984 through December of 1990, Rickey and Cathy jointly deposited $194,878.00 into Cathy's bank account. During this period, the total mortgage payments on the house was approximately $53,600.00 (principal, interest, taxes and insurance). Consequently, over $141,000.00 was spent on food, clothing, entertainment, etc. Therefore, the only logical way to determine what these parties actually contributed towards the house, is to look to the amount of debt acquired by the new mortgage and to the market value of the house on the date of the conveyance to Rickey.

On May 10, 1990, the house had an appraised value of $170,000.00, and a mortgage debt of $126,000.00. Rickey's share of the new mortgage debt was $63,000.00. Thus, he contributed $63,000.00 towards the $170,000.00 value of the house; giving him a 63/170 interest in the house. Cathy's share of the mortgage debt was also $63,000.00, and in addition, Cathy had $44,000.00 in equity accumulated in the house. Thus, Cathy's total contribution was $107,000.00 ($63,000.00 + $44,000.00); giving her a 107/170 interest in the house.

[13]Apportionment under the *Kershman* formula:

with the district court's finding that Cathy did not intend to make a gift of one-half her equity to Rickey and is also a fair and equitable distribution of the proceeds of the house sale.

*Whether appellant is estopped from claiming more than a one-half interest in the house after the execution of the grant, bargain and sale deed.*

Rickey asserts that Cathy is estopped from claiming any prior equity in the house by virtue of the grant, bargain and sale deed by which Cathy conveyed the house to herself and Rickey as tenants in common. Rickey asserts that the deed cut off any prior interest Cathy had in the house. In support of this proposition Rickey cites to NRS 111.170.[14] However, Rickey's reliance on this statute is misplaced.[15]

Under NRS 111.170, a grantor covenants that the property being conveyed is not burdened by any encumbrances. Cathy did not transfer any encumbrances when she conveyed the house to herself and Rickey. The existing mortgage debts were extinguished, and a new mortgage was acquired by Cathy and Rickey. Nothing in NRS 111.170 requires a grantor to convey equal interests to grantees. For example, a grantor could convey a 3/4 interest to one grantee and only a 1/4 interest to another. NRS 111.170 only requires that the grantor convey the property to the

| | | |
|---|---|---|
| Sale price of house | $185,000.00 | |
| Selling expenses | 12,284.37 | |
| Net proceeds | $172,715.63 | |
| | *Cathy* (107/170) | *Rickey* (63/170) |
| Share of net proceeds | $108,709.25 | $64,006.38 |
| Less: Mortgage debt | (63,218.79) | (63,218.78) |
| Apportionment | $45,490.46 | $787.60 |

Since Cathy and Rickey mutually benefitted from their cohabitation, no offset is required.

[14]In relevant part, NRS 111.170 states:

    1. The words "grant, bargain and sell" in all conveyances made after December 2, 1861, in and by which any estate of inheritance or fee simple is to be passed, shall, unless restrained by express terms contained in such conveyances, be construed to be the following express covenants, and none other, on the part of the grantor, for himself and his heirs to the grantee, his heirs, and assigns:

    . . . .

    (b) That the real property is, at the time of the execution of the conveyance, free from encumbrances, done, made or suffered by the grantor, or any person claiming under him.

[15]It is noteworthy that Rickey did not cite any case law to support this proposition.

grantees without encumbrances. Cathy did. Accordingly, NRS 111.170 does not estop Cathy from claiming more than one-half interest in the house.

*Whether the presumption that tenants in common hold equal interests or the presumption contained in NRS 47.250(2) bind appellant.*

It is a disputable presumption that a person intends the ordinary consequences of his voluntary act. NRS 47.250(2). Consequently, Rickey contends that when Cathy conveyed the house to herself and Rickey without expressly stating in the deed that she retained her accumulated equity, that it is presumed that she conveyed all of her equity.

The fractional shares held by tenants in common are usually equal and are presumed to be equal unless circumstances indicate otherwise. Sanders v. Knapp, 674 P.2d 385 (Colo.Ct.App. 1983); *see also* Caito v. United Cal. Bank, 576 P.2d 466 (Cal. 1978); Dessommes v. Dessommes, 505 S.W.2d 673 (Tex. Ct.App. 1974). However, unequal contributions toward acquisition of property by cotenants who are not related and show no donative intent can rebut the presumption of equal shares. Cummings v. Anderson, 590 P.2d 1287 (Wash.Ct.App. 1979); *see also* People v. Varel, 184 N.E. 209 (Ill. 1932); Williams v. Manzingo, 16 N.W.2d 619 (Iowa 1944); Taylor v. Taylor, 17 N.W.2d 745 (Mich. 1945).

In *Williams,* the Iowa Supreme Court held:

[W]e find the rule to be that where a conveyance to purchasers of a tenancy in common is silent these purchasers are presumed to take equal shares. However, this presumption is a rebuttable one and does not prevent proof from being introduced that the respective holdings and the interests of the parties are unequal. In a showing of unequal contribution, in the absence of further proof the prior presumption is overcome and another presumption arises; that is, that the parties intended to share in proportion to the amount contributed by each to the purchase price.

*Williams,* 16 N.W.2d at 622-23.

The district court concluded that Cathy did not intend to make a gift of one-half of her accumulated equity to Rickey. There is substantial evidence in the record to sustain that conclusion. In addition, Cathy's contributions exceeded Rickey's by nearly

$100,000.00.[16] The presumptions asserted by Rickey have been overcome. In the absence of further proof to the contrary, the presumption that Cathy and Rickey intended to share in proportion to the amount each contributed to the purchase price controls the instant case.

*Whether the district court erred in not awarding respondent attorney's fees and costs.*

Rickey contends that the district court erred when it failed to state a reason for denying him attorney's fees and costs. In support of this contention he cites to Lyon v. Walker Baldwin Constr. Co., 88 Nev. 646, 503 P.2d 1219 (1972), where this court held that the failure of the district court to state a reason for refusing to award attorney's fees constitutes abuse of discretion. *See also* Jones v. Jones, 86 Nev. 879, 885, 478 P.2d 148, 152 (1970) (when denying the prevailing party attorney's fees, the district court must state its reason for doing so, so that it is subject to review on appeal, and failure to do so is an abuse of discretion).

The district court has the discretionary power to award attorney's fees to a prevailing party. NRS 18.010(2).[17] The problem with Rickey's contention is that it assumes that he was the prevailing party. This court has held that "[a] plaintiff may be considered the prevailing party for attorney's fee purposes if it succeeds on any significant issue in litigation which achieves some of the benefit is sought in bringing the suit." Hornwood v. Smith's Food King, 105 Nev. 188, 192, 772 P.2d 1294 (1989) (quoting Women's Federal S & L Ass'n. v. Nevada Nat. Bank, 623 F.Supp. 469, 470 (D. Nev. 1985)); *see also* Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); Women's Federal S & L Ass'n. v. Nevada Nat. Bank, 623 F.Supp. 469, 470 (D. Nev. 1985).

---

[16]*See supra* note 7.

[17]In relevant part, NRS 18.010(2) states:

 2. In addition to the cases where an allowance is authorized by specific statute, the court *may* make an allowance of attorney's fees to a prevailing party:

 (a) When he has not recovered more than $20,000; or

 (b) Without regard to the recovery sought, when the court finds that the claim, counterclaim, cross-claim or third-party complaint or defense of the opposing party was brought without reasonable ground or to harass the prevailing party.

(Emphasis added.)

The instant case involved the partition of real property under NRS 39.010. Cathy wanted 99% of the proceeds from the sale of the house. Rickey wanted 50% of the proceeds. The district court made a 82%/18% split of proceeds in favor of Cathy. Under *Hornwood,* Cathy is considered the prevailing party. This court has also held that where the net amount awarded to plaintiff, after deducting the amount found due defendant on counterclaim, exceeded $300.00, that plaintiff was the prevailing party entitled to costs under NRS 18.020. Humphrey v. Sagouspe, 50 Nev. 157, 254 P. 1074 (1927). Under *Humphrey,* Cathy is considered the prevailing party, and considering our conclusion on the division of the net equity, Cathy is clearly the prevailing party.

It was error for the district court to deny attorney's fees without stating a reason for the denial. *Lyon,* 88 Nev. at 650, 503 P.2d at 1221. However, the error was harmless because Rickey was not the prevailing party.

*Whether the district court erred in failing to award appellant contribution or credit in the apportionment of the proceeds where appellant made the entire mortgage payment for five months preceding the sale of the house.*

After Rickey and Cathy separated in February, 1991, Cathy continued to live in the house. Rickey continued to make one-half of the monthly mortgage payment through October, 1991. From November, 1991, through March, 1992, Cathy alone, made the entire mortgage payment. Cathy asked the district court for a credit in the apportionment of the proceeds for the five months preceding the sale in which she made the entire mortgage payment. Rickey admitted that he owed half of those payments "under the traditional rules of contribution between tenants-in-common." However, he urged the district court to deduct the reasonable rental value of the house during this period because he had been ousted by Cathy. The district court rejected the notion that Rickey had been ousted, but its "Memorandum of Decision" did not provide any credit for Cathy's excess contribution during the five months preceding the sale of the house.

The general rule is that where one cotenant is in sole but not adverse possession, the other cotenants are liable for their percentage of mortgage payments. Gilmore v. Gilmore, 328 N.E.2d 562 (Ill.App.Ct. 1875); *see also* Wilmon v. Koyer, 143 P. 694 (Cal. 1914); Conley v. Sharpe, 136 P.2d 376 (Cal.Ct.App. 1943); 4 George W. Thompson, Thompson on Real Property §

1807 (1979). In Lanigir v. Arden, 85 Nev. 79, 450 P.2d 148 (1969), this court stated:

> The majority rule is that in the absence of an agreement to pay, or ouster by the co-tenant in possession, a tenant in common who occupies all or more than his proportionate share of the common premises is not liable, because of such occupancy alone, to his co-tenant for rent or the use and occupation of the premises.
>
> An exception to that rule is that where the co-tenant in possession seeks contribution from the co-tenant out of possession for funds expended for the betterment of the common estate, he must deduct, as an offset, the value of the use of the premises.

*Id.* at 81, 450 P.2d at 149 (citations omitted).

Cathy did not ask for contributions towards improvements of the house. She asked the district court for reimbursement for one-half of the last five mortgage payments that she made alone. Cathy and Rickey had no agreement that Cathy would pay rent after Rickey left the house. Thus, under *Lanigir* there should be no offset for rental value. Consequently, the district court erred when it ignored Cathy's request for contribution.

## CONCLUSION

The district court's denial of respondent's request for attorney's fees is affirmed. In addition, appellant is entitled to reimbursement for one-half of the last five mortgage payments that she made alone. Further, the district court's apportionment of the sale of the house is modified and remanded for action consistent with this opinion.