ELKO COUNTY SHERIFF, JAMES G. MILLER, APPELLANT, v. RONALD CHARLES JACOBSON, JR., AND TAMARA SUE HORVAT, AKA TAMARA SUE SINGH, RESPONDENTS.

No. 18727

October 27, 1988                    763 P.2d 356

*Brian McKay,* Attorney General, Carson City; *Mark D. Torvinen,* District Attorney, Elko, for Appellant.

*Gary D. Woodbury,* Elko, for Respondent Ronald Charles Jacobson.

*Frederick B. Lee,* Public Defender, Elko, for Respondent Tamara Sue Horvat, a.k.a. Tamara Sue Singh.

# OPINION

*Per Curiam:*

Respondent Ronald Charles Jacobson (Jacobson) was charged by information with one count of possession of methylamine, a schedule III controlled substance, and one count of possession of phenylacetic acid (PAA), another schedule III controlled substance, both felonies. The information also charged respondent Tamara Sue Horvat (Horvat) with one count of possession of PAA, and one count of possession of methamphetamine, both felonies. Horvat was also charged with one count of carrying a concealed weapon, a gross misdemeanor. The district court granted respondents' pretrial petitions for writs of habeas corpus. For the reasons set forth below, we affirm the order of the district court.

At respondents' preliminary hearing, Mark Williams, a criminal investigator employed by the State of Nevada, testified that on September 25, 1987, he received a telephone call from the Federal Drug Enforcement Administration (DEA) offices in Salt Lake City. The DEA informed Williams that they had a couple under surveillance in Utah, and that the couple had just purchased three barrels of methylamine and four barrels of PAA from a chemical supply house in Orem, Utah. The DEA also told Williams that the couple was travelling in two vehicles, described the vehicles and advised Williams of the quantities of methylamine and PAA believed to be in each vehicle. Finally, the DEA informed Williams that the couple was westbound on Interstate 80, apparently headed for California. After receiving this information, Williams drove to Wendover, Utah, and awaited the arrival of the DEA agents.

Williams observed respondents driving through Wendover, Utah to Wendover, Nevada. Soon after respondents entered Nevada, they were arrested by state authorities. Jacobson was driving a car and towing a U-Haul trailer. A subsequent search of the trailer revealed three metal barrels containing methylamine and two cardboard barrels containing PAA. Horvat was arrested inside the Peppermill Casino in Wendover. A search of the Chevrolet Blazer that she was observed parking outside the casino revealed two barrels of PAA. The search also revealed a film canister containing a small quantity of methamphetamine,

and hypodermic equipment. Finally, a .22 caliber handgun was removed from Horvat's purse.

Richard Smith (Smith), a criminalist employed by the Washoe County Sheriff's Department, testified at the preliminary hearing that PAA and methylamine are commonly used in the manufacture of methamphetamine. He also stated, however, that both chemicals have legitimate uses.[1] Smith further testified that to make methamphetamine, PAA must be chemically altered to form another substance called phenyl-2-propanone (P2P). The P2P is then mixed with other chemicals to form methamphetamine. Finally, Smith testified that neither methylamine nor PAA in their unprocessed state is commonly abused by drug users. Indeed, Smith testified that both chemicals, by themselves, are toxic.

In their pretrial petitions for writs of habeas corpus, respondents contended, among other things, that PAA was not properly classified as a controlled substance in Nevada. The district court agreed with this argument and dismissed the charges in the information relating to respondents' possession of the PAA. This appeal followed.

Substances become controlled substances when they are placed on any one of five "schedules." *See generally* NRS 453.166-453.206 (setting forth the criteria for inclusion of substances within each schedule). These schedules were formerly set out by statute. In 1981, the legislature empowered the Board of Pharmacy (Board) to designate, by regulation, the substances to be contained in each schedule. *See* NRS 453.146(1). Thus, the legislature made certain that the schedules would be kept current as new substances are developed. *See* Sheriff v. Luqman, 101 Nev. 149, 152, 697 P.2d 107 (1985). The Board's power to designate controlled substances is not unlimited; the legislature directed that when the Board considers controlling a substance, it must weigh the following factors:

(a) The actual or relative potential for abuse;

(b) The scientific evidence of its pharmacological effect, if known;

(c) The state of current scientific knowledge regarding the substance;

(d) The history and current pattern of abuse;

(e) The scope, duration and significance of abuse;

(f) The risk to the public health;

(g) The potential of the substance to produce psychic or physiological dependence liability; and

---

[1]In particular, Smith stated that methylamine is commonly used in the tanning process. This court's own research reveals that PAA is commonly used in the manufacture of penicillin and certain perfumes. *See* Random House Dictionary of the English Language 1453 (2d ed. unabridged 1987).

(h) Whether the substance is an immediate precursor of a controlled substance.

NRS 453.146(2). The legislative scheme also prohibits the Board from controlling a substance solely because it is a precursor to a compound already designated by the Board as an immediate precursor of a controlled substance. *See* NRS 453.146(4).[2]

In 1984, the Board, responding to the request of federal drug agents and other law enforcement authorities, held hearings on a proposed regulation which designated PAA and four other compounds as schedule III controlled substances. At the close of those hearings, the Board determined that the compounds specified in the proposed regulation have "a potential for abuse associated with the preparation of controlled substances." Consequently, the Board designated those compounds as schedule III controlled substances. *See* NAC 453.530(7).[3]

We note that PAA must be chemically altered to form another substance, P2P, which is then combined with other chemicals to form methamphetamine. The Board previously classified P2P as an immediate precursor to methamphetamine and thus designated P2P as a schedule II controlled substance. *See* NAC 453.520(7). Appellant conceded at oral argument that when the Board designated PAA as a controlled substance, it "controlled a precursor to

---

[2]NRS 453.146(4) provides:

If the board designates a substance as an immediate precursor, substances which are precursors of the controlled precursor are not subject to control solely because they are precursors of the controlled precursor.

NRS 453.086 defines the term "immediate precursor" and provides:

"Immediate precursor" means a substance which the board has found to be and by regulation designates as being the principal compound commonly used or produced primarily for use, and which is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled substance the control of which is necessary to prevent, curtail or limit manufacture.

[3]NAC 453.530 provides in pertinent part:

1. The controlled substances listed in this section are included in schedule III.

. . .

7. Unless listed in another schedule, the following substances having a potential for abuse associated with the preparation of controlled substances:
(a) Phenylacetic acid;
(b) Methylamine;
(c) Anthranillic acid;
(d) L-Ephedrine; and
(e) DL-Ephedrine except that any combination or compound containing Ephedrine, or any of its salts or isomers, which is prepared for over-the-counter sale is not a controlled substance for the purpose of this section.

an immediate precursor." Appellant also conceded at oral argument that PAA is not designated as a controlled substance by the federal government, or by the states of Utah or California. Significantly, this court is not aware of any jurisdiction other than Nevada that has designated PAA as a controlled substance. Nevertheless, appellant asserts that the Board properly designated PAA as a controlled substance because that compound has a "potential for abuse," *i.e.* the manufacture of controlled substances. Appellant notes that a substance's "potential for abuse" is properly considered by the Board when it determines whether or not a substance will be designated a controlled substance in this state. *See* NRS 453.146(2)(a), *supra.* Because the Board did not classify PAA as a controlled substance "solely" because it is a precursor of P2P, appellant argues that the Board properly designated PAA as a controlled substance. *See* NRS 453.146(4), quoted at note 2, *supra.* We disagree.

As previously discussed, the Board scheduled PAA as a controlled substance because that substance has a "potential for abuse." The "potential for abuse" that the Board recognized was the role of PAA in the manufacture of controlled substances. NRS 453.146(4), however, clearly provides that the Board may not control a substance solely because that substance is a precursor to another compound that the Board has already designated as an "immediate precursor" of a controlled substance. It is undisputed that the role of PAA in the preparation of controlled substances is as a precursor to P2P, a compound which the Board has already designated and controlled as an immediate precursor of methamphetamine. Under these circumstances, we conclude that without other, compelling reasons to designate PAA as a controlled substance, insufficient grounds existed for the Board to control that compound. *See* NRS 453.146(4). To hold otherwise would nullify the legislative purpose in enacting NRS 453.146(4), *i.e.,* to prevent the Board from controlling compounds that have legitimate commercial uses. Indeed, if this court upheld the regulation challenged in this case, a danger would exist that criminal liability could be imposed for the interstate transportation of PAA for legitimate commercial purposes. Specifically, an individual could legally purchase PAA in another state with the intent of using the substance legitimately in California. If that individual transported the PAA through Nevada while enroute to California, however, the individual's conduct would become felonious. The possibility of such an absurd result demonstrates that the classification of PAA as a controlled substance was inappropriate. Thus, we conclude that the Board exceeded its authority in classifying PAA as a controlled substance. Accordingly, we affirm the order of the district

court granting appellants' pretrial petition for writs of habeas corpus.[4]

GUNDERSON, C. J., YOUNG, SPRINGER, and MOWBRAY, JJ., and WHITEHEAD, D. J., concur.

---

[4]THE HONORABLE THOMAS L. STEFFEN, Justice, voluntarily disqualified himself from consideration of this appeal. The Governor designated The Honorable Jerry C. Whitehead, District Judge, to participate in this appeal. Nev. Const. Art. VI, 4.