JANICE I. FONDI, APPELLANT, *v.* MICHAEL E. FONDI, RESPONDENT.

No. 20744

December 7, 1990                                        802 P.2d 1264

*Feldman, Shaw & DeVore,* Zephyr Cove, for Appellant.

*Robison, Belaustegui, Robb & Sharp,* Reno, for Respondent.

## OPINION

*Per Curiam:*

Janice and Michael Fondi were married on August 25, 1973. At the time of the marriage, Janice worked as a legal secretary in the Carson City district attorney's office, where Michael also served as district attorney. Following the marriage, Janice worked for various state agencies, first as a legal secretary and then as an administrative assistant. She quit full-time employment in 1975, and remained at home for several years before returning to part-time work in 1977 as a secretary for the lieutenant governor. This employment lasted for the duration of the legislative session. Janice also worked for the legislature during the 1979 and 1981 sessions as secretary for the assembly minority leader.

In 1986, appellant began working for the Western Nevada Development District (WNDD) on a part-time basis. In 1989, Janice became employed full-time by that agency as an administrative assistant. At the time of trial, she remained employed by the WNDD, at an annual salary of $16,600.00.

Respondent Michael Fondi is now a district judge for the First

Judicial District Court in Carson City. He was appointed to this position in 1977, following several years service in the Carson City district attorney's office, both as a deputy and district attorney. Judge Fondi has been re-elected as district judge several times and was again re-elected this year.

Janice petitioned for divorce on February 10, 1989. The complaint was originally filed in Clark County, but on March 7, 1989 venue was transferred to the parties' Carson City residence. Trial of this matter proceeded on June 12 and 13, 1989 in district court. Although much testimony was heard by the court, the main issues disputed at trial were the ones contested in this appeal— namely, Janice's share of Michael's retirement pension, and whether she should be awarded alimony.

With regard to the pension issue, the court below determined that Janice was entitled to $1015.00 per month, payable in eight years when Michael reached the minimum retirement age of sixty years. In calculating this award, the court first divided the number of years the parties were married (15.77), by the number of years (25.9) Judge Fondi has currently contributed to the Public Employees Retirement System (PERS). This figure, approximately sixty percent (15.77 ÷ 25.9), was deemed the community share of Michael's pension. The court then determined that Michael's pension would be $3384.00 per month, *were he to retire today*. Thus the court took sixty percent of this number and labeled it the community's interest in the pension—$2030.00 per month. Janice was then awarded one-half of this, or $1015.00 per month. Finally, the court retained jurisdiction over the pension distribution in case future events revealed the division to be inequitable.

On the other main issue of contention, alimony, the court rejected most of Janice's claims. Appellant sought an award of alimony so that she could receive education and retraining (in the field of accounting) in order to obtain a better paying job. The court below found that Janice was "able and intelligent and would be sought after by many employers if she [would pursue] her previous training as a legal secretary . . . ." Therefore, the court refused to provide alimony, although it did award Janice $3000.00 in order to familiarize herself with computer technology changes that had occurred since appellant had last worked as a legal secretary in 1974. Finally, the district court declined to retain jurisdiction in order to consider future alimony requests by Janice. This appeal followed.

### The Community Interest in the Retirement Plan

Appellant's initial contention is that the district court failed to

apportion properly the community interest in Michael's retirement plan. Our recent decision in Gemma v. Gemma, 105 Nev. 458, 778 P.2d 429 (1989), controls our analysis on this issue. In *Gemma,* we held that the "time rule" should be used by the district court in determining the community interest in a retirement plan. *Id.* at 462-63, 778 P.2d at 432. Under this rule, we explained, the community interest is represented by a fraction, the numerator of which is the time the parties were married, the denominator is the total time worked before full retirement benefits may be received. *Id.* at 461, 778 P.2d at 431. Hence, we use the name "time rule," since the community share is directly proportionate to the amount of "time" the parties were married.

In *Gemma,* we did not simply adopt the "time rule," however, we also mandated that the community share of benefits must be measured using the "wait and see" approach. *Id.* at 462, 778 P.2d at 431. More specifically, the *Gemma* court held that the community gains an interest in the pension *ultimately received by the employee spouse,* not simply the pension that would be recovered were the spouse to retire at the time of divorce. *Id.* at 462, 778 P.2d at 432 (emphasis added). Because the size of the ultimate benefits are unknown to the court at the time it renders its decision, the parties must therefore "wait and see" to determine the size of the actual community benefit.[1]

In *Gemma,* the employee spouse pointed out an apparent flaw in this "wait and see" approach. *Id.* at 462, 778 P.2d at 431. Namely, appellant in *Gemma* complained that the pension ultimately received is often measured using the highest salary earned by the employee, and this salary, in turn, is usually the one earned just before retirement, after the divorce has occurred. *Id.* Therefore, Mr. Gemma argued that using the pension ultimately received, rather than the hypothetical pension were the employee to retire at the time of divorce, unfairly allowed the community to benefit from post-divorce labor. *Id.*

We recognized that such an argument may occasionally have

---

[1]The important principle to be gleaned from this "wait and see" discussion is not that *actual division* of the pension plan must wait until the employee spouse is able to retire, it is simply that the community share in the retirement plan must be measured using the pension *received upon retirement.* In practice, the uncertainties involved in calculating future pension increases will often mean waiting until retirement age in order to determine the size of the community benefit. If the size of the pension that will ultimately be received may be determined to a reasonable certainty, however, nothing in this opinion would prohibit division of the pension interests at the time of divorce.

merit. *Id.* at 462-63, 778 P.2d at 431-32. We also noted, however, that in the usual case the early working periods were often "the building blocks to upward mobility and . . . increased salary." *Id.* at 462, 778 P.2d at 431. Because the size of the full pension was therefore based on earlier community labor, we concluded that the community should receive a share of this full benefit, even though such a share may have been based in part upon post-divorce income. *Id.*

We further recognized in *Gemma,* however, that occasionally a substantial increase in retirement benefits might be almost completely due to work or achievement after the marriage. *Id.* As we noted in *Gemma,* such an extraordinary increase in benefits might occur where the employee spouse attains a significantly higher-paying position while remaining within the coverage of the same pension plan, either through earning a post-divorce degree, or transfer within the company to an unrelated area of service. *Id.* Such a situation, we reasoned, stood in sharp contrast to the usual one, where the employee's wage increases were simply due to a rise in the cost of living, or a gradual movement up the corporate ladder. *Id.* at 462, 778 P.2d at 432.

To accommodate this unusual situation, we held that where an employee spouse believes that the income he or she will receive on retirement will be a reflection of increased effort after marriage, this spouse can request that the court retain jurisdiction in the event such predictions become realized. *Id.* at 463, 778 P.2d at 432. Should the district court later agree that the pension was increased due to such extra effort, benefits may then be recalculated "using the highest income the employee spouse would have received under the normal course of events, this being ordinary promotions and cost increases . . . ." *Id.* We reasoned that providing such a procedure would allow the lower courts to accommodate "those relatively few cases" where allowing the non-employee spouse to recover a share of the full pension would be inequitable. *Id.*

It is clear from the above discussion that the court below improperly applied the principles set out in *Gemma.* The trial court in this case calculated the community share in Michael's pension by dividing the number of years the parties were married by the number of years Michael had worked in earning the pension *at the time of the proceedings.* The district court then multiplied this fraction by the amount Michael would receive in benefits *based on his current service in the Nevada retirement system;* that is, the court calculated Michael's pension as if the day of the proceedings were his final working day. Thus the

method used by the trial court runs counter to this court's *Gemma* decision, which required that the community share be determined using the size of the pension *ultimately received.*

In rendering its decision, the court below realized that it was departing from the "time rule."[2] The district court attempted to justify this departure, however, by reasoning that, because Michael was an elected district court judge, his future participation in the pension plan was dependent on his being re-elected. Reasoning that re-election would almost certainly require extraordinary effort, the district court decided that any increase in Michael's pension would be the result of this increased toil, and therefore should not be shared by the community. Nevertheless, since it was possible that Michael would not need to put forth remarkable effort in getting re-elected, the court retained jurisdiction so that if only ordinary effort were expended, the community share of the pension could be adjusted accordingly.

A close examination reveals that the trial court's reasoning is inconsistent with the principles expressed in *Gemma.* In *Gemma,* we held that the initial calculation must always comply with the "time rule" and "wait and see" approaches. Nevertheless, because occasionally this determination would be unfair, we allowed the trial court to retain jurisdiction, in order to permit the *employee* spouse to show that a pension increase was due to extraordinary post-divorce effort.

Under *Gemma,* the trial court cannot, however, *presume* that such spectacular effort will occur, and simply retain jurisdiction to allow the non-employee spouse to show that such effort never came to fruition. The trial court did so here by deciding to calculate Michael's pension as if re-election would necessarily require extra exertion, and then placing the burden on Janice to show that only ordinary effort had taken place. By shifting the burden to the non-employee spouse (who is unlikely to have much information about the amount of energy expended by the other party) in this manner, the trial court improperly applied *Gemma,* and hence, incorrectly calculated the community interest in Michael's pension.[3]

---

[2]In the opinion of the court below, as well as the *Gemma* opinion itself, both "time rule" and "wait and see" concepts are often referred to under the "time rule" label. We make clear today that the two are distinct concepts.

[3]We note that the trial court was correct in its holding that Janice may begin to collect her benefits at the time Michael becomes *eligible* for full retirement benefits; she need not wait until Michael actually retires. *See Gemma,* 105 Nev. at 464, 778 P.2d at 432.

## The Alimony Question

Appellant's second contention is that the district court abused its discretion in failing to award her alimony. Our decision on this issue is guided by our recent ruling in Heim v. Heim, 104 Nev. 605, 763 P.2d 678 (1988). In *Heim,* we held that the district judge must, in making an alimony decision, "form a judgment as to what is equitable and just, having regard to the respective merits of the parties and to the condition in which they will be left by divorce." *Id.* at 609, 763 P.2d at 680. We then applied this standard and concluded that, under the circumstances, a $500.00 per month alimony award was not "equitable and just," and therefore was an abuse of discretion. *Id.* at 612-13, 763 P.2d at 683.

*Heim* involved a couple that had been married for thirty-five years. *Id.* at 606, 763 P.2d at 678. During the marriage, the husband had earned a Ph.D. and achieved a position as department chairperson of a state university, at a salary of $5600.00 per month. *Id.* at 606-07, 763 P.2d at 678-79. By contrast, the wife did not pursue her own employment or career so that she could remain at home and raise the parties' six children. *Id.* at 606, 763 P.2d at 678. At the time of the divorce, therefore, the wife had no professional skills, was fifty-seven years old, and had never earned more than $600.00 per month. *Id.* at 607, 763 P.2d at 679. Consequently, under the terms of the district court award in *Heim,* the wife was left with only a 1982 Buick, a mortgaged house in Detroit (worth approximately $10,000.00), and a future interest in half of her husband's retirement benefits, in addition to her $500.00 per month alimony award. *Id.*

We reasoned in *Heim* that such a settlement created an "enormous disparity in the status and quality of life of the two marital partners . . . ." *Id.* at 611, 763 P.2d at 681. We further noted that part of this unfairness was due to the fact that the husband had obtained the ability during the marriage to earn $67,000.00 per year, while the wife left the marital partnership having obtained "virtually nothing." *Id.* at 611, 763 P.2d at 682. This court pointed out that if the trial court's distribution were allowed to stand, divorce would take Mrs. Heim from a position of "relative prosperity" to one of "destitution."[4] Because such a result would have been manifestly unjust, we vacated the $500.00 alimony stipend and remanded the case for reconsideration of the award,

---

[4]*Id.* at 612, 763 P.2d at 683. On this point, the court further noted that, "[a] woman is not a breeding cow to be nurtured during her years of fecundity, then conveniently and economically converted to cheap steaks when past her prime." *Id.* at 611, 763 P.2d at 682 (citation omitted).

"not necessarily limited to the $1500.00 per month prayed for by [Mrs.] Heim." *Id.* at 613, 763 P.2d at 683.[5]

Appellant contends that her situation is closely analogous to that in *Heim.* There are, however, several important differences between that case and the one at bar. First, the Fondis' marriage was of much shorter duration than the one in *Heim,* and here Judge Fondi had obtained both his legal degree, and his standing in the legal community, prior to the marriage. Second, Janice leaves the marriage with marketable skills as a legal secretary.[6] These skills, especially after they are brought up to date with the $3000.00 awarded by the district court, indicate that this is not a situation where one party leaves the marriage without a viable means of supporting her or himself.

[5]The *Heim* case is not this state's only response to the situation where one spouse leaves the marriage having obtained marketable skills, while the other leaves with "virtually nothing." In 1989, the legislature passed amendments to NRS 125.150 that must now serve as a guide to district courts presented with such a predicament. These amendments, which became effective October 1, 1989, require that in formulating alimony awards, the lower courts shall consider a spouse's need for obtaining career-related training. NRS 125.150(8) further mandates that the lower courts, in addressing the problem, consider both: (1) whether the spouse who would pay such alimony has obtained greater job skills during the marriage; and (2) whether the spouse who would receive such alimony provided financial support while the other spouse obtained job skills or education.

The legislative history of these amendments indicates that they were passed as a response to the growing number of *unskilled* spouses who are forced into poverty as the result of a divorce. *See Minutes of the Assembly Committee of Judiciary,* 65th Sess. at 4-5 (May 22, 1989). The legislature therefore created this measure as a way of allowing these spouses to obtain some sort of job skill, especially in situations where community funds and labor have been used to educate and train the other spouse. *Id.* at 5. Such a measure, the bill's sponsors reasoned, would have the added benefit of increasing Nevada's workforce and reducing the state's welfare roles. *Id.* at 6.

The trial court's ruling in this case does not run afoul of the requirements of NRS 125.150(8). To begin, that section merely requires that the trial court "consider" the possibility of job training for the non-working spouse. In this case, the trial court did examine this option, but rejected it because it found that Janice already possessed marketable skills as a legal secretary. Also, since Janice already boasts these abilities, she is not within the class of unskilled workers that this statute was designed to benefit. Finally, neither of the scenarios posited under NRS 125.150 exist here, since Michael brought both his legal skills and reputation into the marriage, and therefore did not receive any financial support from Janice in acquiring these assets. Accordingly, NRS 125.150 provides no support for appellant's argument that the trial court's failure to provide alimony was error.

[6]The record reveals that Janice received nine months of training as a legal secretary from the Reno Business College. After completing this training in 1967, she worked as a legal secretary from 1968 until 1974. As discussed above, she has also held several part-time secretarial jobs since 1975.

Another important difference between this case and *Heim* is that Janice leaves the marriage with far more property than did the spouse in *Heim*. Janice received a $91,000.00 cash award under the district court order, not including her interest in Michael's retirement plan. A further distinguishing characteristic is that Janice was never obligated to stay home and raise children. The marriage here was childless, and although Michael's twelve-year-old son from a previous marriage moved in with the Fondis in 1978, the record indicates that Janice was not required to stay home and care for him. Nor did she always do so, as her work for the legislature in 1979 and 1981 reveals.

The conclusion that Janice's situation after divorce will not be as critical as Mrs. Heim's does not end our inquiry. Any examination into the "equity and justice" of the lower court's ruling requires more than a mechanical comparison with the facts of the *Heim* case itself. *Heim* mandates that this court examine the totality of the circumstances in order to determine whether the court below abused its discretion in rendering its alimony decision.

Such an examination reveals that the district court did not abuse its discretion under the facts and circumstances of this case. Although an exhaustive list of our reasons for so concluding is impossible, we find the following facts especially persuasive: the size of the cash award received by Mrs. Fondi, the amount of the pension plan that she will ultimately secure, and the fact that each party leaves the marriage with the same marketable skills and talents that were initially brought to the union. We caution, however, that each situation will be examined on its own facts, and although Janice's situation is substantially different from that of Loretta Heim, our review of the record indicates that this was a very close case. Consequently, we are slow to approve the trial court's denial of alimony.

### Retention of Jurisdiction Over Future Alimony Claims

Appellant's final contention is that the district court abused its discretion by failing to retain jurisdiction over future alimony claims. In support of this position appellant cites In re Marriage of Morrison, 20 Cal.3d 437, 143 Cal.Rptr. 139 (1978). In *Morrison,* the court held that "[a] trial court should not terminate jurisdiction *to extend a future support order* after a lengthy marriage unless the record clearly indicates that the supported spouse will be able to adequately meet his or her financial needs at the time selected for termination of jurisdiction." *Id.* at 453, 143 Cal.Rptr. at 150 (emphasis added).

Janice asserts that, based on the above-quoted passage, the trial court erred in failing to retain jurisdiction, because it was not clear from the record that she would be able to support herself adequately after her $3000.00 retraining stipend became exhausted.

We disagree. By its very terms, the quoted passage applies only to decisions to *extend future alimony payments*. In such a situation, the trial court has made a decision that alimony is proper, and has also made a *prediction* as to *how long* such an award should continue. Because the course of the future events on which such a prediction rests in unknowable, it is logical to require the retention of jurisdiction, unless, as stated in *Morrison,* the record clearly indicates that alimony will no longer be necessary at the time set by the court for the termination of payments.

The present situation is properly treated differently, however, for two reasons. First, unlike the scenario in *Morrison,* the trial court here has determined that alimony is *improper.* Further, this determination was not based on future events, but on facts known to the trial judge at the time the decision was made. Thus the decision of whether to retain jurisdiction after alimony has been denied involves an analysis of the same factors as the decision of whether alimony was proper in the first place. Accordingly, where, as here, the decision to deny alimony was proper, it follows that the court's decision to terminate jurisdiction is also.

### Conclusion

The trial court failed to apportion properly the community interest in Michael's retirement plan. The district judge measured the community share using the pension that Michael would receive were he to retire today, and then retained jurisdiction in case Janice could later show that such a distribution was inequitable. Our holding in *Gemma,* however, requires that the district court measure the community interest using the pension ultimately received by Michael, and, if necessary, retain jurisdiction to allow Michael to show that his future salary increases (and corresponding pension increases) were the result of extraordinary effort.

The ruling denying Janice an award of alimony, however, was not an abuse of the district court's discretion. Janice possesses marketable employment skills, received a good deal of money from the settlement, and did little to enhance Michael's earning power. Thus it was not "inequitable" to deny her an award of alimony. Since no support payments were awarded, the district

court properly declined to retain jurisdiction over the alimony question.

Accordingly, the opinion of the court below is reversed and remanded for a recalculation of the community interest in Michael's pension, and affirmed in all other respects.