ALICIA MARGARITA SHYDLER, Appellant, v. THOMAS J. SHYDLER, Respondent.

No. 25444

February 26, 1998 — 954 P.2d 37

*Marshal S. Willick,* Las Vegas, for Appellant.

*Jolley, Urga, Wirth & Woodbury,* Las Vegas, for Respondent.

## OPINION

By the Court, SHEARING, J.:

Respondent Thomas J. Shydler ("Tom") and Alicia Margarita Shydler ("Margaret") married on June 9, 1976. Tom was a recent college graduate and Margaret worked as an insurance underwriter. After the wedding, Tom began working for Crestmont, a construction company owned and operated by his father, Hal Shydler.

In 1979, Hal helped Tom set up his own construction-development company, Aztec Enterprises ("Aztec"). By the late 1980s, Aztec began to earn a substantial profit. Aztec's economic success continued through March 1992, when Tom and Margaret separated, and June 1993, when the divorce decree was issued. During the marriage, Tom drew salaries, bonuses, and distributions ranging from $60,000 to as much as $200,000 per year.

In early 1982, Margaret founded Alamo Insurance Company ("Alamo") with a partner for $62,500. Approximately three years later, Margaret and Tom purchased the partner's interest in Alamo. Margaret received "officer compensation" of $57,000 in 1983, $33,000 in 1984, and $24,000 in 1985. Alamo recorded losses during this period. From 1986 through 1991, Alamo made profits of less than $21,000 per year and Margaret's individual compensation declined substantially. In 1992 and early 1993, Aztec loaned over $60,000 to Alamo in an attempt to keep Alamo afloat. Since the filing of the divorce complaint in early 1992, Alamo's viability has steadily worsened.

The parties' marital troubles began many years prior to the filing of the divorce complaint. Due to three DUI convictions, Tom's driver's license was revoked, requiring Margaret to drive Tom to work for a period of ten months. Margaret claims that Tom's heavy drinking and related problems caused her to neglect her insurance business.

According to Tom, Margaret was an addicted gambler who often spent several nights a week gambling. Apparently, Margaret won substantial monies as a result of her gambling. This included more than $60,000 between early 1992, the time of the filing of the divorce complaint, and June 1993, when the final decree of divorce was entered.

According to Tom, he made a deal with Margaret concerning a piece of property ("Lot 54") jointly purchased by the couple in 1987. Tom claims that Margaret quitclaimed her interest in the property to Tom in exchange for her right to keep all her gambling winnings. Margaret claims that her failure to properly

execute the deed voided the transfer; therefore, she alleges that she still owns her interest in Lot 54.

Tom filed for divorce in March 1992. On April 13 and 14, 1992, the parties appeared before domestic relations referee Terrance Marren ("Referee Marren"). A referee's note issued May 28, 1992, recommended that Tom pay $500 per month per child in child support, various living expenses for Margaret and the children, and $5,000 per month in temporary spousal support. Tom objected to the payment as excessive in light of his take-home pay, which was allegedly less than $9,000 per month. On June 10, 1992, District Court Judge Joseph Bonaventure ("Judge Bonaventure") affirmed Referee Marren's report. The parties dispute whether Tom complied with any of these support awards.

In fall 1992, Tom filed motions to reconsider the temporary spousal support award, to remove lis pendens burdening Aztec's accounts, and to regain possession of his personal property, namely his toy soldier, library, and military artifact collections. These possessions remained in the family residence occupied by Margaret and the couple's children—whose custody had been previously awarded to Margaret. Before Referee Marren could make a final recommendation on the matter, the case was reassigned to Judge Fine in the newly-created family court. On April 16, 1993, Judge Fine modified the temporary support order, increasing the temporary spousal support to $6,000.00 per month.

After hearing the evidence at trial, Judge Fine rendered an oral disposition in which she made the relevant findings and conclusions of law, summarized as follows:

> (1) The parties had mutually consented to transfer Lot 54 to Tom, as his sole and separate property, in consideration of Margaret's gaming winnings.
>
> (2) Tom's toy soldier, lithograph, and library collections were to be held in trust by Tom for the couple's son Alex.
>
> (3) The remaining community property was to be divided equally.
>
> (4) Tom received all the stock, bank accounts, funds, and liabilities associated with Aztec.
>
> (5) Margaret received all of the community's real property and chattels, and $215,798 payable in monthly $5,000 installments for a period of 38 months.
>
> (6) Margaret was to receive no spousal support in view of the pretrial spousal support she received and the $5,000 per month she was to receive for her portion of the community property.

This appeal followed the district court's written order.

## DISCUSSION

*Spousal support*

Margaret argues that the district court abused its discretion by denying her spousal support.

This court reviews district court decisions concerning divorce proceedings for an abuse of discretion. Williams v. Waldman, 108 Nev. 466, 471, 836 P.2d 614, 617 (1992). Rulings supported by substantial evidence will not be disturbed on appeal. *Id.*, 836 P.2d at 617. "However, a court must award such alimony as appears 'just and equitable,' having regard to the conditions in which the parties will be left by the divorce." Sprenger v. Sprenger, 110 Nev. 855, 859, 878 P.2d 284, 287 (1994); *see* NRS 125.150(1)(a). In *Sprenger,* this court enumerated seven factors to be considered in determining the appropriate alimony award:

> (1) the wife's career prior to marriage; (2) the length of the marriage; (3) the husband's education during the marriage; (4) the wife's marketability; (5) the wife's ability to support herself; (6) whether the wife stayed home with the children; and (7) the wife's award, besides child support and alimony.

*Sprenger,* 110 Nev. at 859, 878 P.2d at 287 (citing Fondi v. Fondi, 106 Nev. 856, 862-64, 802 P.2d 1264, 1267-69 (1990)).

In the case at bar, during the seventeen-year marriage, Tom obtained a general contractor's license, built up a successful company that made a net profit of $793,141 in 1991, and generally earned annual compensation in excess of $100,000. Thus, during that period, Tom, like the husband in *Sprenger,* "developed the business acumen which has provided him with a thriving business and substantial assets." *See Sprenger,* 110 Nev. at 859, 878 P.2d at 287.

During the marriage, Margaret continued working in the insurance industry. She also founded her own insurance company, Alamo. While her business was, by all accounts, less successful as time passed, Margaret had the opportunity to develop marketable skills. However, the record reveals that Tom's drinking problems may have interfered with Margaret's work, particularly during a ten-month period of time when Tom could not legally drive.

Despite her work experience, Margaret's potential post-divorce earning potential is well below Tom's. An expert witness testified that the maximum salary Margaret could expect to earn as an insurance adjuster is $59,000. Tom testified that he believed Margaret could earn $25,000 at Alamo. A salary of $25,000 to

$59,000 is clearly not at parity with Tom's documented earnings of more than $100,000. *See* Rutar v. Rutar, 108 Nev. 203, 827 P.2d 829 (1992). Moreover, expert testimony revealed that Alamo would require at least six months to return to break-even status.

In denying an award of spousal support, the district court focused on two sets of payments flowing from Tom to Margaret: pre-divorce support payments and post-divorce community property equalizing installment payments. With respect to the former, the district court noted in its written findings that Margaret had received "in excess of $165,000 (in addition to child support) during the (pre-divorce) period of January, 1992, through June, 1993, with the result that she has in essence received 33 months of spousal support at a rate of $5,000 per month."

The record indicates that the $165,000 in pre-divorce payments were mainly disbursed for then-current community expenses. Thus, this award was not alimony rendered solely for the benefit of Margaret. Payment of such interim support should not preclude a post-divorce spousal support award, particularly where part or all of those interim payments are used to make payments on community property.

With respect to the post-divorce property equalizing payments, the district court noted:

> [Margaret] will have sufficient funds with which to support herself, even pending the financial recovery of Alamo Insurance Company and completion of counseling, through payments to be made to her by [Tom] to equalize the division of community property comprising of 36 payments of $5,000 per month plus one payment of $4,566, and will also have access of [sic] other substantial assets awarded to her in that division of community property.

In other words, the district court awarded Tom the portion of the community property which was producing an annual income in excess of $100,000, while Margaret's share of the community property was to be dissipated in the immediate future to provide for Margaret's living expenses so that Tom would not have to pay spousal support. This is unfair.

A community property award made to a spouse serves to divide community property acquired during marriage to which the recipient spouse is entitled as a matter of law, including community property in the form of compensation for labor and skills of a working spouse performed during marriage. *See* NRS 123.220-

.225; NRS 125.150(1)(b); McNabney v. McNabney, 105 Nev. 652, 660, 782 P.2d 1291, 1296 (1989); Sly v. Sly, 100 Nev. 236, 240, 679 P.2d 1260, 1263 (1984).

Alimony is an equitable award serving to meet the post-divorce needs and rights of the former spouse. *Cf.* Gardner v. Gardner, 110 Nev. 1053, 1057, 881 P.2d 645, 647 (1994); NRS 125.150. It follows from our decisions in this area that two of the primary purposes of alimony, at least in marriages of significant length, are to narrow any large gaps between the post-divorce earning capacities of the parties, *see Gardner,* 110 Nev. at 1056-58, 881 P.2d at 647-48; *Rutar,* 108 Nev. at 206-08, 827 P.2d at 831-33, and to allow the recipient spouse to live "as nearly as fairly possible to the station in life [] enjoyed before the divorce." *Sprenger,* 110 Nev. at 860, 878 P.2d at 287-88 (quoting Heim v. Heim, 104 Nev. 604, 612-13, 763 P.2d 678, 683 (1988)). The individual circumstances of each case will determine the appropriate amount and length of any alimony award. *See Gardner,* 110 Nev. at 1056-58, 881 P.2d at 647-48; *Rutar,* 108 Nev. at 206-08, 827 P.2d at 831-33.

As property and alimony awards differ in purpose and effect, the post-divorce property equalization payments payable to Margaret in this case do not serve as a substitute for any necessary spousal support. *Cf.* Wolff v. Wolff, 112 Nev. 1355, 1359-60, 929 P.2d 916, 919 (1996). Although the amount of community property to be divided between the parties may be considered in determining alimony, the district court's order in the instant case compelled Margaret to utilize her community property share for support, while Tom's share of the community property was actually providing a substantial income for his support. By determining that the community property equalizing payments acted as a substitute for alimony, Margaret received a lesser share of the community property than Tom. We conclude that the district court improperly denied alimony on the grounds that Margaret had received a property award.

The district court was wrong in finding that Tom's pre-divorce support and post-divorce property equalizing payments obviated the need for any post-divorce spousal support.[1]

In light of the disparate incomes of the parties and the lifestyle

---

[1]We also find it troubling that the district court emphasized Margaret's apparent misuse of community funds during the separation, but failed to adequately consider Tom's apparent misuse of community funds to support another woman.

enjoyed by Margaret prior to the divorce, we further conclude that the equities of this case favor an award of spousal support, at least for a period of rehabilitation. While our case law does not require the district court to award alimony so as to effectively equalize salaries, an alimony award must nonetheless be awarded when just and equitable, and be set at a fair rate based on the individual circumstances of the parties. We remand this case to the district court to determine a fair award of alimony.

*Award of Tom's collectibles to Tom in trust for the parties' minor son*

In this case, the district court's findings of fact and conclusions of law stated, "It is the Court's intention to divide the community assets equally with the exception of the toy soldier and militaria collection, lithographs and library, which shall be held by [Tom] in trust for the parties' son, Alexander."

Margaret alleges that the court exceeded its authority by exempting this portion of the community property from either division or offset, as required by NRS 125.150(1)(b).[2] She also contends that the trust was established for an improper purpose under the statute, in that it was not designated as being set apart for support of the parties' child.

Tom argues that courts generally have the authority to order that a part of the parties' property be held in trust for the benefit of minor children, citing Bailey v. Bailey, 86 Nev. 483, 471 P.2d 220 (1970). He also contends that courts derive this authority from statutory language granting them discretion in providing for the support of minor children and in distributing the assets of the parties, citing NRS 125.150(4)-(5) and NRS 125B.180.

*Bailey* relies on NRS 125.140, now recodified as NRS 125.510, for the court's authority to provide for child support in the form of a trust. 86 Nev. at 488, 471 P.2d at 223. In Paine v. Paine, 71 Nev 262, 265, 287 P.2d 716, 717 (1955), this court considered that statute, stating:

> While, under the statute, the court has discretion to act when the matter before it concerns children, their interests or welfare, there is nothing upon which discretion may properly operate when such subjects are in no way involved. To proceed to an exercise of discretion in the absence of a basis for such exercise is error.

In the case at bar, the collections were not set aside for child

---

[2]NRS 125.150(1)(b) states, in relevant part: "In granting a divorce, the court shall . . . make an equal disposition of the community property of the parties. . . ."

support and, indeed, would not have been appropriate for that purpose; therefore, *Bailey* and NRS 125.510 do not justify the "trust" provision of the district court's order. The other authority cited by Tom is equally inapplicable.

The division of collectibles in no way directly affects the financial support or welfare of the parties' children. No statutes provide district courts with authority to order a portion of community assets to be placed into a trust for a minor child, unless the trust is established for the support of the child. Accordingly, we hold that the district court exceeded its authority in placing the community property toy soldier and militaria collection, lithographs and library into a trust for the parties' son. We reverse this aspect of the divorce decree and remand for valuation of that personal property, with that amount to be divided equally between the parties.

### Other Issues

There was evidence in the record to support the district court's valuation of Aztec and Alamo. However, on remand, we direct the district court to address the inconsistency between its overall valuation of Aztec in the oral disposition ($807,000) and that specified in its written findings of fact and conclusions of law ($744,505).

We also conclude that substantial evidence supports the district court's finding that Tom and Margaret entered into a valid contract transmuting Lot 54 into Tom's separate property. *See* Trident Construction v. West Electric, 105 Nev. 423, 427, 776 P.2d 1239, 1241 (1989); *see also* Nyberg v. Kirby, 65 Nev. 42, 51, 188 P.2d 1006, 1010 (1948) ("The consideration may be any benefit conferred or any detriment suffered, . . . and the law will not enter into an inquiry into its adequacy.").

### CONCLUSION

Applying the *Sprenger* factors, we conclude that the district court abused its discretion by denying alimony to Margaret. We remand this case to the district court to determine a fair award. We also conclude that the district court erred by placing certain property into a trust for the benefit of the parties' son. We remand this case to the district court for valuation of the toy soldier and militaria collection, lithographs and library, with that amount to be divided equally among the parties. We also direct the district court to address the inconsistency between the valuation of Aztec in the oral disposition and in its written order.

We affirm the district court's order in all other respects.

ROSE, YOUNG, and MAUPIN, JJ., concur.

SPRINGER, C. J., dissenting:

I would affirm the family court's decree.

*Alimony*

My first disagreement with the majority opinion is its sending the case back to the trial court "to determine a fair award" of alimony. In my view, the trial court acted well within its discretionary powers in deciding that the husband should not be required to make post-divorce support payments. I think that the record supports this decision and that this court should not be "second-guessing" the trial court.

There is evidence to support the conclusion that the wife has a number of professional and occupational skills and that she has an earning capacity of around $60,000.00 per year. There is a certain amount of conflict in the record as to the earning capacities of the parties; but as I see it, there is no basis for this court's rejecting the trial court's findings and judgment and concluding that there is such a "large gap[]" in earning capacities of the parties that alimony is required as a matter of law.

The trial court made a specific finding that the wife would have "sufficient funds" with which to support herself. There is no reason for this court to reject that finding; and I see nothing in the record from which this court is obliged to conclude that the wife will be in need of additional "spousal support" from her former husband.

I agree with the majority that "[a]limony is an equitable award serving to meet the post-marriage needs and rights of the former spouse"; but a trial court is in a much better position to examine and weigh the equities in these cases than is an appellate court.

*"Battle of the Toy Soldiers"*

My second disagreement with the majority opinion is that I do not believe it necessary that we return this case to the trial court to renew the "Battle of the Toy Soldiers" between Ms. Shydler and her son. There are a number of reasons why we should leave the trial court's judgment alone. One reason is that the trial judge was entitled to believe Mr. Shydler's testimony that there were only a "few fragments" left of the toys and that Ms. Shydler was responsible for abusing and damaging "hundreds" of soldiers. The trial court could have concluded that, under these circumstances, there was next to nothing left to fight over and that Mr. Shydler should be awarded the surviving toy soldiers in trust for his son. The trial court's judgment could be justified by recognizing that some of the toys belonged to the son and that some of the toys were concededly the separate property of Mr. Shydler.

Whatever proportion of unbroken soldiers might be characterized as community property, I do not know; but the trial court would have been justified in concluding that the community property segment of the remaining "fragments" was of such little value that Ms. Shydler had no appreciable claim to this property.

Finally, as I will discuss later in this dissent, awarding the toys to the father in trust for the son was justified under NRS 125.150(4).

I have a difficult time understanding why this court would give serious attention to Ms. Shydler's claim to her son's toys; but, since it does, I will discuss the matter further.

Mr. Shydler's Pretrial Memorandum states as one of four "issues presented," the issue of "whether [Ms. Shydler] destroyed or concealed portions of the parties' toy soldier and militaria collection during the pendency of this action." If, of course, Ms. Shydler had during the pendency of this action actually destroyed or concealed this property, the trial court would have had compelling reasons for awarding this property to Mr. Shydler. Although there is no finding of malice or property destruction that would expressly support an unequal division of community property based on "compelling reasons," I do believe that there is sufficient evidence in the record to justify an unequal division of whatever the community's interest in the "fragments" might be. Further, as I have said, the toy soldiers that were left in Ms. Shydler's custody during divorce proceedings were actually part community property, part Mr. Shydler's separate property (collected since high school days) and part the son's property. In awarding the toys to the father in trust for the son, the trial court was, to some extent, awarding property that already belonged to the father and son. It surprises me that Ms. Shydler would want to go back to court to engage in what looks to me like a rather petty and demeaning fight with her son over toy soldiers.

When asked to testify as to what remained of the toy collection after it was left in Ms. Shydler's custody, Mr. Shydler testified that there were only "[a] few fragments." He testified that the soldiers had been "severely abused and damaged" and that there were "literally hundreds of figures that had been broken and smashed and they were all piled and shoved in behind in the corner of the desk."

Ms. Shydler denies smashing the soldiers and suggests that perhaps "the kids [might] have done some damage"—she did not "keep and eye on them." She may not have kept an eye on them, but she does admit, while living in the parties' home during the divorce proceedings, to putting up a sign on the garage that she was going to hold a "toy soldier and book sale." She testified that she did not actually intend to sell the toysoldiers and that the "intention behind the sign" was only "[t]o make Tom worry about it." This kind of malice might work to her disadvantage

when she goes back to the trial court to make her claim of right to the "few fragments" that remain of her son's toy soldier collection.

Finally, I believe that the trial court's judgment is supported by NRS 125.150(4). This statute would permit the court to set apart community property (assuming that there is some community property interest in the soldiers) for the benefit of the child. Although the statute speaks of "support" of the child, I do not think that it is stretching the statute too far to say that making these toys available for the boy's use is a form of support. In any event, the court did not abuse its discretion in doing what it did; and I would leave the family court decree in place.

*Grounds for denying alimony*

Finally, I register my disapproval of the majority's taking certain remarks of the trial judge out of context and concluding that the trial court denied alimony "on the grounds that Margaret had received a property award." No such "grounds" were stated by the trial judge. I see this case as one more case in a series of cases in which this court seeks to "micro-manage" the work of the family courts.[1]

---

[1]*See, e.g.,* McDermott v. McDermott, 113 Nev. 1134, 946 P.2d 177 (1997) (SPRINGER, J., dissenting); Hopper v. Hopper, 113 Nev. 1138, 946 P.2d 171 (1997) (SPRINGER, J., dissenting).