# IN THE SUPREME COURT OF THE STATE OF NEVADA

BRYAN LYSTER PARKER,
Appellant,
vs.
MARY DIANE GREEN,
Respondent.

No. 73176  **FILED**

JUN 25 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## *ORDER VACATING JUDGMENT, REVERSING, AND REMANDING*

This is an appeal from an order denying a motion to set aside a judgment in a family law matter. Eighth Judicial District Court, Family Court Division, Clark County; Lisa M. Brown, Judge.

Prior to commencing a domestic partnership, appellant Bryan Parker and respondent Mary Green entered into a signed and notarized agreement wherein Bryan would pay Mary $2,500 per month, until death or remarriage, if the parties permanently ended their relationship based on Bryan's infidelity or dishonesty.[1] The agreement stated that any payments would end if the parties reconciled. Bryan subsequently breached the agreement and the parties terminated their domestic partnership. In the stipulated decree of termination of domestic partnership, the parties incorporated the prior agreement by novation and Bryan agreed to continue paying Mary $2,500 per month as tort damages until Mary died or remarried. The decree also included a waiver of alimony and stated that the payments would continue even if the parties reconciled.

The parties then entered into a second domestic partnership. Two years later, Bryan filed a motion to modify alimony or, alternatively,

---

[1]The parties know the facts of this case and we state them here only as necessary for analysis.

SUPREME COURT
OF
NEVADA

(O) 1947A

18-24157

set aside the judgment, arguing that the payments were intended to be modifiable alimony or, alternatively, the judgment should be vacated per NRCP 60(b). The district court denied the motion. Bryan now appeals, arguing that the district court erred by failing to find that the agreement constituted modifiable alimony or that he could be relieved from the judgment.[2]

## DISCUSSION

Bryan argues that the payments set forth in the agreement and decree constitute alimony—financial support provided after a legally recognized relationship. *See* NRS 125.150(1); *see also* NRS 122A.200 (granting the same rights, protections, and benefits to domestic partners as are granted to spouses, except where otherwise provided by law.). He argues this in spite of the fact that the decree contains an express waiver of alimony and specifically names the payments as tort damages. Bryan asks this court to look to the underlying relationship agreement between the parties, clarify that the payments set forth in the decree were intended to be alimony, and thereby modify or render satisfied the alimony payments set forth in the decree. "Because a district court's interpretation of a divorce decree presents a question of law, this court reviews such an interpretation de novo." *Henson v. Henson*, 130 Nev. 814, 818, 334 P.3d 933, 936 (2014).

"A contract is ambiguous if it is reasonably susceptible to more than one interpretation." *Margrave v. Dermody Props., Inc.*, 110 Nev. 824,

---

[2]On appeal, Mary argues that neither the district court nor this court have jurisdiction over the matter. We hold that we have jurisdiction because there is a right to appeal after entry of an order to grant or deny a modification of alimony. *See Siragusa v. Siragusa*, 108 Nev. 987, 989, 843 P.2d 807, 808 (1992).

827, 878 P.2d 291, 293 (1994). Despite the language of the express waiver in the decree, Bryan argues that the nature of the payments creates an ambiguity as to whether they are alimony payments or tort damages. First, while alimony can be a monthly allotment with no clear end, Bryan points out that tort damages generally require a judgment of a final, total amount. *See Frantz v. Johnson*, 116 Nev. 455, 469-70, 999 P.3d 351, 360 (2000) (indicating that a reasonableness determination for damages inherently requires a quantifiable amount that can be reviewed by the court); *see also Bongiovi v. Sullivan*, 122 Nev. 556, 580-83, 138 P.3d 433, 450-53 (2006). Here, the periodic payments are indefinite, making it nearly impossible to calculate a final, total amount of "damages."

Second, the language used in the decree terminates the payments upon death or remarriage, which mirrors standard alimony language. *See Sprenger v. Sprenger*, 110 Nev. 855, 860, 878 P.2d 284, 287 (1994). Bryan argues that the lack of a total damage amount, coupled with the fact that the payments terminate upon death or remarriage, provides proof that the parties intended the award to be alimony and makes the language of the decree ambiguous. We agree with Bryan's contention that the decree is reasonably susceptible to the interpretation that the payments were meant to be alimony.

Therefore, it is necessary to delve beyond the express terms of the decree and "examine the circumstances surrounding the parties' agreement in order to determine the true mutual intentions of the parties." *Shelton v. Shelton*, 119 Nev. 492, 497, 78 P.3d 507, 510 (2003) (quoting *Hilton Hotels v. Butch Lewis Prods.*, 107 Nev. 226, 231, 808 P.2d 919, 921 (1991)). Examining the intent of the parties requires us to look not only at the decree, but to the underlying agreement incorporated into the decree.

*Mizrachi v. Mizrachi*, 132 Nev., Adv. Op. 66, 385 P.3d 982, 989 (2016) ("[A] court that is called upon to clarify the meaning of a disputed term in an agreement-based decree must consider the intent of the parties in entering into the agreement.").

The original agreement was written by Bryan in anticipation of the parties' domestic union and outlines the payments that will be made to Mary if the union were to terminate. The agreement contains a provision wherein Bryan agrees to pay Mary $2,500 per month "for the rest of her life, or until she marries someone in the future," if the break up is permanent and is precipitated by Bryan's infidelity and dishonesty. It further states that "[i]f our relationship were to end per the stipulations in this agreement, and payments are being made, and in the future we decided to get back together again, payments would then cease." This language plainly supports an alimony interpretation.

Additionally, from the facts alleged by the parties, it appears that the relationship agreement was drafted, primarily, due to Mary's exposure to Bryan's sexually transmitted disease. It appears that Mary feared an inability to live in accord with "the station in life she enjoyed" before breaking up with Bryan, due to this disease exposure and the hardships it would impose upon any future relationships. *Sprenger*, 110 Nev. at 860, 878 P.2d at 287. Such is an unconventional, but not unheard of, consideration for alimony.

Finally, we hold that construing the underlying contract as one for tort damages goes against public policy. An agreement which regulates the details of a person's daily life in order to prevent infidelity, and then penalizes that infidelity with excessive "damages" stemming from causes of action not recognized within this state, is not an enforceable contract.

Nevada is a no-fault divorce state and does not have a statute allowing for damage recovery for transmission of a sexually transmitted disease. Thus, we take a page from California's book where a court of appeals held that a party's contract awarding excessive liquidated damages for the "serious emotional, physical and financial injury" caused to one spouse by the other's infidelity was against California public policy because "[f]ault is simply not a relevant consideration in the legal process by which a marriage is dissolved." *Diosdado v. Diosdado*, 118 Cal. Rptr. 2d 494, 474 (2002). Here, in a state which for decades has been nearly synonymous with the concept of no-fault divorce, we find that logic sound. *See Rodriquez v. Rodriquez*, 116 Nev. 993, 998, 13 P.3d 415, 418 (2000).

Accordingly, based on the language of, and the motivation behind, the relationship agreement, as well as the fact that the decree fully incorporated the original relationship agreement, we hold that the parties intended the payments as modifiable alimony. As such, we conclude that the payments constitute alimony.

Bryan then asks this court to modify or set aside the alimony payments. NRS 125.150(6) states that "[i]n the event of the death of either party or the subsequent remarriage of the spouse to whom specified periodic payments were to be made, all the payments required by the decree must cease." The parties entered into a second domestic partnership just a few months after filing the stipulated decree. Under NRS 125.150(6), this second domestic partnership legally terminated the alimony payments and the parties did not enter into a second relationship agreement, nor did they take action to renew the agreement currently at issue. While the decree also contains a provision stating that the payments will not end upon a potential second domestic partnership, this waiver fails for the same

SUPREME COURT
OF
NEVADA

(O) 1947A

5

reasons stated above. It is clear from the totality of the evidence presented by the parties that they intended the payments to end upon death, remarriage, or reconciliation.

Moreover, just as infidelity is not an appropriate consideration for divorce, it is also an inappropriate consideration when determining an alimony award. *Rodriquez*, 116 Nev. at 998, 13 P.3d at 418. Therefore, we decline to permit payments to continue because the record demonstrates here that they are punitive rather than need-based. However, an alimony "decree or agreement is not subject to modification by the court as to accrued payments." NRS 125.150(8). Thus, any payments Bryan made to Mary prior to his motion to the district court do not fall within the scope of this order.

"[A] court must award such alimony as appears 'just and equitable,' having regard to the conditions in which the parties will be left by the divorce." *Shydler v. Shydler*, 114 Nev. 192, 196, 954 P.2d 37, 39 (1998) (quoting *Sprenger*, 110 Nev. at 859, 878 P.2d at 287). Considering what is "just and equitable" under the facts of this case, the mandates set forth in NRS 125.150, and the public policy rationale discussed above, we conclude, in equity,[3] that Mary may retain all funds she has received under the terms of the agreement between the parties, but that the district court shall terminate all future payments as of the date of the filing of this order. Accordingly, we

---

[3]We note that, because our holding is equitable in nature due to the unique facts of this case, we decline to remand this matter to this district court for consideration of the factors set forth in NRS 125.150(9).

ORDER the judgment of the district court VACATED AND REVERSED AND REMAND this matter to the district court for proceedings consistent with this order.

_____Pickering_____, J.
Pickering

_____Gibbons_____, J.
Gibbons

_____Hardesty_____, J.
Hardesty

cc: Hon. Lisa M. Brown, District Judge, Family Court Division
Carolyn Worrell, Settlement Judge
Kainen Law Group
Black & LoBello
Eighth District Court Clerk