PONDER, Justice.
 

 After carefully reviewing the testimony in this case and the law applicable thereto, we have arrived at the conclusion that the trial judge has properly disposed of this matter in his written opinion, which we adopt as our opinion, in affirming the judgment, viz.:
 

 “Alvin Chavis died April 2, 1943, and on April 12, 1943, Gladys Chavis, alleging herself to be the surviving community spouse, filed an application for appointment as A.d
 
 *316
 
 ministratrix of his estate, and on May 10, 1943, no opposition having been filed, she was appointed and qualified as such, and an inventory and appraisement of the property was made and filed.
 

 “The property at the time Alvin Chavis, died was occupied by him and Onelia Chavis as a homestead and on the same day on which Gladys Chavis qualified as Administratrix she made demand on Onelia Chavis to vacate and surrender possession of the property and upon her refusal to vacate the property Gladys Chavis on May 18, 1943, applied for and obtained an order authorizing the Sheriff to dispossess Onelia Chavis and to deliver the property to Gladys Chavis, the Administratrix. Before the execution of this order, however, Onelia Chavis filed an intervention alleging that she, herself, was the surviving community spouse of Alvin Chavis, and that two children were born of their marriage, and that as such she claimed the ownership of an undivided one-half of the property left by the deceased, and that she was entitled to remain in the possession thereof. She further alleged that she had, as community spouse, paid the funeral expenses, etc. and her willingness and determination to assume and pay the mortgage indebtedness on the property and any other debts of the estate and that an administration was unnecessary. She then prayed for and obtained a temporary restraining order restraining the Sheriff from any attempt to dispossess her of the property and a rule nisi directed to the Sheriff and the said Gladys Chavis to show cause why the restraining order should not be made permanent. The. intervenor further prayed that the order appointing Gladys Chavis as Administratrix be annulled on the ground that it had been obtained through fraud and misrepresentation, and further that she be recognized as the owner of an undivided one-half of the property and her two minor children the owner of the remaining half.
 

 “Gladys Chavis filed first an exception of no cause or right of action as against the effort of the intervenor to procure an injunction, and then filed an answer, which in effect, was a general denial.
 

 “On the issue as thus presented by the pleadings, the case went to trial on its merits, with reservation of the rights of Gladys Chavis under her exception of no cause or right of action.
 

 “The facts, together with the pleadings, which disclose the issues presented in this case are substantially as follows: Alvin Chavis and Gladys Chavis were married in the City of Lake Charles on April 14, 1934. There were two children born of this marriage, viz.: (1) Alvin Junius Chavis, now eight years of age, and (2) Joyce Marie Chavis, now seven years of age. Some time during the month of June, 1937, Alvin Chavis and his wife separated and on January 28, 1938 he filed a suit
 
 against his
 
 wife for a separation from bed and board and on May 18, 1938, a judgment by default
 
 *318
 
 was procured decreeing a separation from bed and board in his favor based on the ground of cruel and inhuman treatment. In the meantime, however, on February 28, 1938, before the judgment decreeing the separation had been granted, and before the year thereafter had elapsed for obtaining a final decree of divorce, Alvin Chavis married Onelia Chavis. Onelia Chavis, it appears at the time of the marriage resided with her parents in Opelousas, in St. Landry Parish, and the marriage license was procured from the Clerk’s Office in Opelousas, although the marriage ceremony was performed in the Catholic Church in Lake Charles, and the two have resided in Lake Charles since, and two children were born of this marriage, viz: (1) Harvest Chavis, born December 21, 1938, and (2) Peter Clayton Chavis, born August 14, 1942.
 

 “Thereafter on April 2, 1943 Alvin Chavis died. The inventory made of the property left by the deceased shows both real and personal property aggregating in value the sum of $2,650.00. The evidence shows that -all this property was acquired subsequent to his marriage to Onelia Chavis and that no property, whatever, had been acquired by him during his marriage with Gladys Chavis, prior to his purported marriage to Onelia Chavis.
 

 “The record shows that the real estate involved in this suit was acquired as recited in the deed by ‘Alvin Chavis, married to and living with Onelia Chavis, born Thibodeaux’ from Eugenia Reynaud by deed dated July 20, 1940, more than two years after his purported marriage to Onelia Chavis. Thereafter by deed dated October 1, 1941 he conveyed this property to the Calcasieu Building & Loan Association and in that deed it is recited that the grantor ‘Alvin Chavis, married to and living with Onelia Chavis, born Thibodeaux’ and on the same date the Calcasieu Building & Loan Association re-conveyed this property to the said ‘Alvin Chavis, married to and living with Onelia Chavis, born Thibodeaux’ and in which a vendor’s lien was reserved for $1,100.00 indicating that Chavis had procured a loan to finance the building of a home on the property.
 

 “As this Court interprets this case, the principal and practically the sole issue presented to the Court is whether or not Onelia Chavis acted in good faith when she married Alvin Chavis. If in fact Onelia Chavis married Alvin Chavis in an honest and reasonable belief that the marriage was valid and that no legal impediment existed, then in such case it would appear that all her civil rights and -those of her children born of that marriage will be preserved just as though there had been in fact no legal impediment to their marriage.
 

 “Article 117 of the Civil Code provides, that:
 

 “‘The marriage, which has been declared null, produces nevertheless its civil effects as it relates to the parties and their
 
 *320
 
 children, if it has been contracted in good faith.’
 

 “Article 118 of the Civil Code provides, that:
 

 “ ‘If only one of the parties acted in good faith, the marriage produces its civil effects only in his or her favor and in the favor of the children born of the marriage.’
 

 “The term ‘good faith’ as used in these Articles of the Civil Code has been construed to mean an honest and reasonable belief that the marriage is valid and that no legal impediment thereto exists. Under these Articles, therefore, it may well be that there was in fact some legal impediment to the marriage and that the marriage in point of fact is null, yet if the parties had an honest and reasonable belief that the marriage is valid and that no legal impediment thereto exists then all the civil rights of the parties and those of their children are preserved. Likewise, where one of the parties has an honest and reasonable belief that the marriage is valid and that no legal impediment thereto exists, then in such case the rights of such spouse and the rights of his or her children born of that marriage will be preserved notwithstanding bad faith on the part of the other spouse.
 

 “It may well be that unconfirmed rumors or mere suspicions may reach a party and such as may even cause some question or doubt to arise as to the validity of a marriage, yet it would appear under our jurisprudence that under certain conditions a party may be in ‘good faith’ so long as no certain or authoritative knowledge of some legal impediment comes to him or her, but to just what extent a party is called upon to make an investigation to ascertain whether there exists any legal impediment to his or her marriage in order to establish his or her status as a putative spouse, will depend ultimately upon the facts and circumstances in each individual case. Our courts have simply said that ‘a party alleging good faith can not close her ears to information or her eyes to suspicious circumstances. She must not act blindly or without reasonable precautions.’ For a detailed and lengthy discussion on our jurisprudence on these questions, see: Smith v. Smith, 43 La.Ann. 1140, 10 So. 248; Wiley v. Stewart, 145 La. 1081, 83 So. 260; Miller et als. v. Wiggins, 149 La. 720, 90 So. 109; Ray v. Knox, 164 La. 193, 113 So. 814; Dillon v. Traders & General Insurance Co., La.App., 183 So. 553; Succession of Glover, La.App., 153 So. 496; Succession of Thomas, 144 La. 25, 80 So. 186.
 

 “A review of this jurisprudence shows, unmistakably that the question of ‘good faith’ in putative marriages is a question of fact and must be determined by the trial Court. It must be further noted that what constitutes ‘good faith’ as here used is not an absolute quality but is relative, and depends ultimately upon the facts and circumstances in each individual case. There
 
 *322
 
 is danger in accepting the jurisprudence applicable in any particular case of this character as the established jurisprudence governing any other single case of this sort. The facts and circumstances in any particular case involving a question of good faith differ in some respect from the facts and circumstances in every other case. There is equal danger in accepting an isolated quotation, or even a whole decision based on the facts in a certain case as an authority on the facts which may exist in any other case. Our Appellate Courts, therefore, have established only with reasonable certainty certain broad rules or principles of jurisprudence within which limits trial Courts must be governed.
 

 “It may be observed that there is a well recognized rule that the burden of proof upon the question of good faith rests upon the person who alleges fraud or bad faith. In other words, where a man and woman live together as husband and wife, there is a presumption that they have been validly married, and that a marriage, although in fact null, was contracted in good faith.
 

 • "In analyzing the evidence in this case as a basis for the Court’s conclusions, it appears that there are several points mostly in detail but none the less vital, where the evidence is confusing and conflicting. It does not appear to this Court that it would serve any useful purpose to undertake any sort of a comprehensive analysis of this evidence, especially as to that portion which is confusing and conflicting. There are, however, certain well established or uncontradicted facts and circumstances which stand out and upon which this Court will rely largely in reaching its conclusions.
 

 “Alvin Chavis and Gladys Chavis separated in Lake Charles in June of 1937 and never resided together thereafter. Both of 'these parties continued to reside in Lake Charles. Onelia Chavis prior to and at the time of her marriage to Alvin Chavis resided in Opelousas in St. Landry Parish. After Alvin Chavis and Gladys Chavis had separated he began paying attentions to Onelia Chavis and on February 28, 1938 they were publicly married in the Catholic Church in Lake Charles according to the practice in that church, the marriage license having been procured in the Parish of St. Landry where Onelia Chavis resided with her parents. On January 28, 1938, however, just one month before their marriage, Alvin Chavis, through his attorney, filed a suit against Gladys Chavis for a judgment of separation from bed and board, based on the ground of cruel and inhuman treatment, and on May 18, 1938 a judgment by default was obtained decreeing a separation from bed and board. Alvin Chavis and Onelia Chavis after their marriage established their matrimonial domicile in Lake Charles and continued to live together until his death on April 2,
 
 *324
 
 1943, or for a period of a little more than five years and during which time two children were born of this union. The evidence further shows that at the time of the separation between Alvin Chavis and Gladys Chavis there existed no community property whatever; that on July 20, 1940, more than two years after the marriage of Alvin Chavis and Onelia Chavis they acquired the real estate involved in this suit from Eugenia Reynaud, and that in 1941 he procured a loan from the Calcasieu Building and Loan Association and erected a home on the property in which they resided up to the time of his death. The record shows further that during the entire five years of their married life, Gladys Chavis also lived in Lake Charles, and during this whole period so far as the record shows she never raised the least protest to either Alvin Chavis or to Onelia Chavis as to their marriage, apparently believing herself, that they were validly husband and wife; nor did she ever raise any protest or objection until after the death of Alvin Chavis. She does not appear to have contributed a penny to the acquisition or improvement of the property involved in this suit, but immediately after his death and for the first time she seems to have become obsessed with the idea that she was still his community spouse and as such entitled to one-half of all this property left by him at his death and which was acquired entirely through the union of the labors of Alvin Chavis and Onelia Chavis. The record further shows as an evidence of good faith that after the death of Alvin Chavis this Onelia Chavis proceeded to pay all the funeral expenses, herself, and also for a lot and tomb in the cemetery, besides other community debts. .
 

 “There was a line of evidence to the effect that Onelia Chavis was advised by relatives of Alvin Chavis that Alvin Chavis was married to Gladys Chavis. The evidence on
 
 this point is
 
 conflicting. Onelia Chavis says she knew that Alvin Chavis had been married to Gladys Chavis, .but that they had separated when she and Alvin Chavis began going together. She further says that Alvin Chavis assured her that he had obtained a divorce from Gladys Chavis, and that all his people had told her that Alvin and Gladys had separated, and says further that at the time they were married she honestly believed that he was divorced.
 

 “With this conception of the facts and circumstances this Court feels satisfied under all the circumstances that Onelia Chavis is entitled to be recognized as the putative wife of Alvin Chavis, deceased and as such she and the children of this marriage are entitled to the same civil rights as to the property involved in this suit as though the marriage had been valid. In the opinion of this Court, it is immaterial that Alvin Chavis, himself, was in bad faith.
 

 “The judgment in the opinion of this Court, should be one recognizing Onelia
 
 *326
 
 Chavis as the putative wife or Alvin Chavis, deceased and as such entitled to the ownership of an undivided one-half of the property involved in this suit and that the two children born of this marriage together with the two children born of the marriage with Gladys Chavis are entitled to the ownership in equal undivided proportions of the remaining one-half of the said property.
 

 “This Court is further of the opinion that an administration of this succession is unnecessary and that the order appointing Gladys Chavis as administratrix should be annulled.”
 

 Counsel for the appellant contends that since the second spouse knew of the existence of the prior wife, who was still alive, that she was under a duty to make an investigation to determine beyond the mere word of the man she intended to marry, that he had in fact secured a divorce from his former wife before she could be considered in good faith. He cites authorities to support this contention.
 

 For the purpose of this decision we may concede that his contention is correct; but it could not afford appellant any relief under the circumstances in this case. As heretofore pointed out, there were additional reasons why the second wife was led to believe that no impediment existed to her marriage to the deceased.
 

 For the reasons assigned, the judgment is affirmed at appellant’s cost.