RICHARD E. WILLIAMS, Appellant, v. MARCIE C. WILLIAMS, Respondent.

No. 40324

September 13, 2004                                        97 P.3d 1124

[Rehearing denied November 9, 2004]

[En banc reconsideration denied December 15, 2004]

*Jeffrey Friedman,* Reno, for Appellant.

*Richard F. Cornell,* Reno, for Respondent.

Before BECKER, AGOSTI and GIBBONS, JJ.

# OPINION

*Per Curiam:*

This is a case of first impression involving the application of the putative spouse doctrine in an annulment proceeding. Under the doctrine, an individual whose marriage is void due to a prior legal impediment is treated as a spouse so long as the party seeking equitable relief participated· in the marriage ceremony with the good-faith belief that the ceremony was legally valid. A majority of states recognize the doctrine when dividing property acquired during the marriage, applying equitable principles, based on community property law, to the division. However, absent fraud, the doctrine does not apply to awards of spousal support. While some states have extended the doctrine to permit spousal support awards, they have done so under the authority of state statutes.

[Headnote 1]

We agree with the majority view. Consequently, we adopt the putative spouse doctrine in annulment proceedings for purposes of property division and affirm the district court's division of the property. However, we reject the doctrine as a basis of awarding equitable spousal support. Because Nevada's annulment statutes do not provide for an award of support upon annulment, we reverse the district court's award of spousal support.

## FACTS

On August 26, 1973, appellant Richard E. Williams underwent a marriage ceremony with respondent Marcie C. Williams. At that time, Marcie believed that she was divorced from John Allmaras. However, neither Marcie nor Allmaras had obtained a divorce. Richard and Marcie believed they were legally married and lived together, as husband and wife, for 27 years. In March 2000, Richard discovered that Marcie was not divorced from Allmaras at the time of their marriage ceremony.

In August 2000, Richard and Marcie permanently separated. In February 2001, Richard filed a complaint for an annulment. Marcie answered and counterclaimed for one-half of the property and spousal support as a putative spouse.[1] In April 2002, the parties engaged in a one-day bench trial to resolve the matter.

---

[1] In the event the district court rejected Marcie's putative spouse theory, she also alleged an interest in the property under an implied contract theory pursuant to *Western States Construction v. Michoff,* 108 Nev. 931, 840 P.2d 1220 (1992). Because we adopt the putative spouse doctrine, *Michoff* is not controlling.

At trial, Richard testified that had he known Marcie was still married, he would not have married her. He claimed that Marcie knew she was not divorced when she married him or had knowledge that would put a reasonable person on notice to check if the prior marriage had been dissolved. Specifically, Richard stated that Marcie should not have relied on statements from Allmaras that he had obtained a divorce because Marcie never received any legal notice of divorce proceedings. In addition, Richard claimed that in March 2000, when Marcie received a social security check in the name of Marcie Allmaras, Marcie told him that she had never been divorced from Allmaras. Marcie denied making the statement.

Marcie testified that she believed she was not married to her former husband, John Allmaras, and was able to marry again because Allmaras told her they were divorced. Marcie further testified that in 1971, she ran into Allmaras at a Reno bus station, where he specifically told her that they were divorced and he was living with another woman. According to Marcie, she discovered she was still married to Allmaras during the course of the annulment proceedings with Richard. Marcie testified that if she had known at any time that she was still married to Allmaras, she would have obtained a divorce from him.

During the 27 years that the parties believed themselves to be married, Marcie was a homemaker and a mother. From 1981 to 1999, Marcie was a licensed child-care provider for six children. During that time, she earned $460 a week. At trial, Marcie had a certificate of General Educational Development (G.E.D.) and earned $8.50 an hour at a retirement home. She was 63 years old and lived with her daughter because she could not afford to live on her own.

Both parties stipulated to the value of most of their jointly-owned property. At the time of the annulment proceeding, the parties held various items in their joint names, including bank accounts, vehicles, life insurance policies, a Sparks home, a radiator business, and a motorcycle.

The district court found that Marcie had limited ability to support herself. The district court also concluded that both parties believed they were legally married, acted as husband and wife, and conceived and raised two children. Marcie stayed home to care for and raise their children. Based upon these facts, the district court granted the annulment and awarded Marcie one-half of all the jointly-held property and spousal support. The district court did not indicate whether its award was based on the putative spouse doctrine or an implied contract and quantum meruit theory. The final judgment divided the parties' property so that each received

assets of approximately the same value. It also ordered Richard to pay Marcie the sum of $500 per month for a period of four years as ''reimbursement and compensation for the benefit received by [Richard] by way of [Marcie's] forgoing a career outside the home in order to care for [Richard] and their children.'' Richard timely appealed the district court's judgment.

## DISCUSSION

### Annulment

A marriage is void if either of the parties to the marriage has a former husband or wife then living.[2] Richard and Marcie's marriage was void because Marcie was still married to another man when she married Richard. Although their marriage was void, an annulment proceeding was necessary to legally sever their relationship. An annulment proceeding is the proper manner to dissolve a void marriage and resolve other issues arising from the dissolution of the relationship.[3]

### Assertions of error

First, Richard contends that Marcie is not entitled to one-half of their joint property because their marriage was void. Richard asserts that application of the putative spouse doctrine and quasi-community property principles was improper. Alternatively, Richard argues that if the district court relied on implied contract and quantum meruit theories, the district court should have divided the parties' residence according to this court's decision in *Sack v. Tomlin,*[4] which would provide Richard with 67 percent of the assets instead of 50 percent.

Second, Richard argues that the district court erred in awarding spousal support. Richard contends support is not permitted, absent statutory authority, under the putative spouse doctrine and that there is no basis in Nevada law for awarding compensation for services rendered during the marriage under a theory of quantum meruit.

Because the record does not reflect the basis for the district court's decision, resolution of Richard's contentions requires us to address the putative spouse doctrine.

---

[2]NRS 125.290(2).

[3]*See Hicklin v. Hicklin,* 509 N.W.2d 627, 631 (Neb. 1994) (recognizing that an annulment proceeding was proper when one party had a spouse living at the time of his purported marriage to the other party).

[4]110 Nev. 204, 871 P.2d 298 (1994).

*Putative spouse doctrine*

Under the putative spouse doctrine, when a marriage is legally void, the civil effects of a legal marriage flow to the parties who contracted to marry in good faith.[5] That is, a putative spouse is entitled to many of the rights of an actual spouse.[6] A majority of states have recognized some form of the doctrine through case law or statute.[7] States differ, however, on what exactly constitutes a "civil effect." The doctrine was developed to avoid depriving innocent parties who believe in good faith that they are married from being denied the economic and status-related benefits of marriage, such as property division, pension, and health benefits.[8]

The doctrine has two elements: (1) a proper marriage ceremony was performed, and (2) one or both of the parties had a good-faith belief that there was no impediment to the marriage and the marriage was valid and proper.[9] "Good faith" has been defined as an "honest and reasonable belief that the marriage was valid at the time of the ceremony."[10] Good faith is presumed. The party asserting lack of good faith has the burden of proving bad faith.[11] Whether the party acted in good faith is a question of fact.[12] Unconfirmed rumors or mere suspicions of a legal impediment do not vitiate good faith " 'so long as no certain or authoritative knowledge of some legal impediment comes to him or her.' "[13] However, when a person receives reliable information that an impediment exists, the individual cannot ignore the information, but instead has a duty to investigate further.[14] Persons cannot act

---

[5]*Hicklin,* 509 N.W.2d at 631.

[6]*Id.*

[7]Christopher L. Blakesley, *The Putative Marriage Doctrine,* 60 Tul. L. Rev. 1 (1985); *see* Cal. Fam. Code § 2251 (West 1994); Colo. Rev. Stat. Ann. § 14-2-111 (West 2003); 750 Ill. Comp. Stat. Ann. 5/305 (West 1999); La. Civ. Code Ann. art. 96 (West 1999); Minn. Stat. Ann. § 518.055 (West 1990); Mont. Code Ann. § 40-1-404 (2003).

[8]*See Cortes v. Fleming,* 307 So. 2d 611, 613 (La. 1973) (noting that the doctrine has been applied to issues involving legitimacy of children, workers' compensation benefits, community property, and inheritance).

[9]Blakesley, *supra* note 7, at 6.

[10]*Hicklin,* 509 N.W.2d at 631.

[11]*Id.* at 632.

[12]*Galbraith v. Galbraith,* 396 So. 2d 1364, 1369 (La. Ct. App. 1981).

[13]*Garduno v. Garduno,* 760 S.W.2d 735, 740 (Tex. App. 1988) (quoting *Succession of Chavis,* 29 So. 2d 860, 862 (La. 1947)).

[14]*Id.*

" 'blindly or without reasonable precaution.' ''[15] Finally, once a spouse learns of the impediment, the putative marriage ends.[16]

We have not previously considered the putative spouse doctrine, but we are persuaded by the rationale of our sister states that public policy supports adopting the doctrine in Nevada. Fairness and equity favor recognizing putative spouses when parties enter into a marriage ceremony in good faith and without knowledge that there is a factual or legal impediment to their marriage. Nor does the doctrine conflict with Nevada's policy in refusing to recognize common-law marriages or palimony suits. In the putative spouse doctrine, the parties have actually attempted to enter into a formal relationship with the solemnization of a marriage ceremony, a missing element in common-law marriages and palimony suits. As a majority of our sister states have recognized, the sanctity of marriage is not undermined, but rather enhanced, by the recognition of the putative spouse doctrine. We therefore adopt the doctrine in Nevada.

We now apply the doctrine to the instant case. The district court found that the parties obtained a license and participated in a marriage ceremony on August 26, 1973, in Verdi, Nevada. The district court also found that Marcie erroneously believed that her prior husband, Allmaras, had terminated their marriage by divorce and that she was legally able to marry Richard. In so finding, the district court also necessarily rejected Richard's argument that Marcie acted unreasonably in relying on Allmaras' statements because she had never been served with divorce papers and that she had a duty to inquire about the validity of her former marriage before marrying Richard.

Although Richard's and Marcie's testimony conflicted on this issue, judging the credibility of the witnesses and the weight to be given to their testimony are matters within the discretion of the district court.[17] "This court reviews district court decisions concerning divorce proceedings for an abuse of discretion. Rulings supported by substantial evidence will not be disturbed on appeal."[18] Substantial evidence is that which a sensible person may accept as adequate to sustain a judgment.[19] We apply the same standard in

---

[15]*Id.* (quoting *Chavis,* 29 So. 2d at 863).

[16]*Id.*

[17]*Castle v. Simmons,* 120 Nev. 98, 103, 86 P.3d 1042, 1046 (2004).

[18]*Shydler v. Shydler,* 114 Nev. 192, 196, 954 P.2d 37, 39 (1998).

[19]*See Schmanski v. Schmanski,* 115 Nev. 247, 251, 984 P.2d 752, 755 (1999).

annulment proceedings. The district court was free to disregard Richard's testimony, and substantial evidence supports the district court's finding that Marcie did not act unreasonably in relying upon Allmaras' representations. The record reflects no reason for Marcie to have disbelieved him and, thus, no reason to have investigated the truth of his representations. Although older case law suggests that a party cannot rely on a former spouse's representation of divorce, more recent cases indicate this is just a factor for the judge to consider in determining good faith.[20] We conclude that the district court did not err in finding that Marcie entered into the marriage in good faith. She therefore qualifies as a putative spouse. We now turn to the effect of the doctrine on the issues of property division and alimony.

## Property division

Community property states that recognize the putative spouse doctrine apply community property principles to the division of property, including determinations of what constitutes community and separate property.[21] Since putative spouses believe themselves to be married, they are already under the assumption that community property laws would apply to a termination of their relationship. There is no point, therefore, in devising a completely separate set of rules for dividing property differently in a putative spouse scenario. We agree with this reasoning.

In some states, courts apply community property principles to divide property acquired during the purported marriage.[22] In other states, the property is considered to be held under joint tenancy principles and is divided equally between the parties.[23] Regardless of the approach, all states that recognize the putative spouse doctrine divide assets acquired during the marriage in an equitable fashion. We conclude that the application of community property principles to a putative marriage, as indicated in *Sanguinetti v. Sanguinetti*,[24] is the better approach to the division of property in such cases.[25] In this case, the district court treated the parties'

---

[20]*Gathright v. Smith,* 368 So. 2d 679, 683-84 (La. 1978).

[21]Blakesley, *supra* note 7, at 31.

[22]*Sanguinetti v. Sanguinetti,* 69 P.2d 845, 847 (Cal. 1937).

[23]*Garduno,* 760 S.W.2d at 739.

[24]69 P.2d at 847.

[25]Different rules may apply when one of the parties qualifies as a putative spouse and the other does not. When a person enters into the relationship with knowledge of an impediment and knowledge the marriage is not valid, some states have found the person who acted in bad faith is not entitled to benefit from the marriage. We do not reach this issue because the facts of this case involve two innocent putative spouses.

property as quasi-community property and equally divided the joint property between the parties. Substantial evidence supports the district court's division, and we affirm the district court's distribution of the property.

## Spousal support

States are divided on whether spousal support is a benefit or civil effect that may be awarded under the putative spouse doctrine.[26] Although some states permit the award of alimony, they do so because their annulment statutes permit an award of rehabilitative or permanent alimony.[27] At least one state, however, has found alimony to be a civil effect under the putative spouse doctrine even in the absence of a specific statute permitting an award of alimony.[28]

We have not previously ruled on whether a district court may award spousal support after an annulment. The only case in Nevada that discusses spousal support in connection with an annulment is our 1912 decision in *Poupart v. District Court.*[29] In *Poupart,* spousal support was awarded *pendente lite,* but no permanent or rehabilitative support was granted. Although we stated in dictum that " 'the right to alimony depends on a valid and subsisting marriage, since, without this, there is no obligation for the support of the alleged wife,' "[30] *Poupart* did not address the putative spouse doctrine. Because the facts in *Poupart* are not analogous to the instant case, *Poupart* offers us little guidance.

Nevada statutes do not provide for an award of alimony after an annulment. Thus, the cases in which alimony was awarded pursuant to statute are of little help in resolving this issue. In those cases, state legislatures had codified the putative spouse doctrine and specifically indicated that issues such as property division and alimony were to be resolved in the same manner as if the void

---

[26]Blakesley, *supra* note 7, at 41.

[27]*Matter of Marriage of Dennis,* 958 P.2d 199 (Or. Ct. App. 1998); *Jones v. Jones,* 296 P.2d 1010 (Wash. 1956); Cal. Fam. Code § 2254 (West 1994); Colo. Rev. Stat. Ann. § 14-2-111 (West 2003); 750 Ill. Comp. Stat. Ann. 5/305 (West 1999); Minn. Stat. Ann. § 518.055 (West 1990); Mont. Code Ann. § 40-1-404 (2003).

[28]*Cortes v. Fleming,* 307 So. 2d 611 (La. 1973). While the Louisiana Supreme Court did not rely on a statute specifically granting a putative spouse the right to alimony in its decision, the court did use an annulment statute as a basis of the award. The court indicated the term "civil effect" in the annulment statute was broad enough to include alimony. Nevada does not have similar language in its annulment statutes.

[29]34 Nev. 336, 123 P. 769 (1912).

[30]*Id.* at 339, 123 P. at 770 (quoting *Cyclopedia of Law & Proc.,* 26 Cyc. 917 (1901)).

marriage had been valid. Absent such a determination by the Nevada Legislature, we must look to the cases in which courts have either refused to award alimony in the absence of statutory authority, despite recognizing the doctrine for other purposes, or awarded spousal support based on the putative spouse doctrine.

In *McKinney v. McKinney,* the Georgia Supreme Court summarily stated that alimony is not available in an equitable action for annulment because the right to alimony depends upon a valid marriage.[31] This reflects the general rule expressed in *Poupart.* However, unlike *Poupart,* the Georgia Supreme Court does appear to have relied on the putative spouse doctrine in dividing the parties' property since it discussed concepts of good faith. Thus, it appears that the Georgia court declined to award alimony under the doctrine.[32]

The California Supreme Court followed the same rationale in *Sanguinetti,*[33] noting that a putative spouse has no right to an allowance of alimony. However, the California Supreme Court found that a putative spouse could maintain a claim under quantum meruit for the reasonable value of the services that the putative spouse rendered to the marriage if there was fraud or fault (such as cruelty) committed by the party opposing alimony.[34]

In a similar case, *Kindle v. Kindle,*[35] the Florida Court of Appeals upheld an award of alimony when the husband failed to disclose his previous marriage and was not divorced when he entered into a second marriage ceremony. Preston and Kikeu Kindle were married for 20 years when the court granted an annulment. At the time the couple married, Preston was already married, but he never disclosed this to Kikeu. The trial court found that Kikeu was an innocent victim of Preston's wrongdoing and awarded Kikeu permanent alimony. The Florida Court of Appeals upheld the permanent alimony award based on equitable principles.[36] The court further stated that "[i]t would be grossly inequitable to deny alimony to a putative wife of a twenty-year marriage because the husband fraudulently entered into a marriage ceremony."[37]

*Sanguinetti* and *Kindle,* however, are distinguishable from the instant case. In those cases, the courts found fraud, bad faith or bad conduct, such as cruelty, to support the award of equitable alimony. In the instant case, Richard and Marcie each acted in good faith.

---

[31] 250 S.E.2d 470, 472 (Ga. 1978).

[32] *Id.*

[33] 69 P.2d 845 (Cal. 1937).

[34] *Id.* at 847.

[35] 629 So. 2d 176 (Fla. Dist. Ct. App. 1993).

[36] *Id.* at 176-77.

[37] *Id.* at 177.

Neither Richard nor Marcie knowingly defrauded the other, and there is no evidence of misconduct or bad faith.

We can find no case, and Marcie has cited to none, in which spousal support was awarded to a putative spouse absent statutory authority, fraud, bad faith or bad conduct. Although one commentator favors such awards on the theory that the purpose of the putative spouse doctrine is to fulfill the reasonable expectations of the parties,[38] we are unaware of any court adopting such a standard.

The putative spouse doctrine did not traditionally provide for an award of spousal support.[39] Extensions of the doctrine have come through statute or findings of fraud and bad faith. As neither is present in this case, we decline to extend the doctrine to permit an award of spousal support when both parties act in good faith. Richard and Marcie's marriage was void, and there was no showing of bad faith or fraud by either party. Absent an equitable basis of bad faith or fraud or a statutory basis, the district court had no authority to grant the spousal support award, and we reverse that part of the judgment awarding spousal support.

## CONCLUSION

We conclude that an annulment proceeding is the proper method for documenting the existence of a void marriage and resolving the rights of the parties arising out of the void relationship. We adopt the putative spouse doctrine and conclude that common-law community property principles apply by analogy to the division of property acquired during a putative marriage. However, the putative spouse doctrine does not permit an award of spousal support in the absence of bad faith, fraud or statutory authority. Therefore, we affirm that portion of the district court's order equally dividing the parties' property and reverse that portion of the order awarding spousal support.[40]

---

[38]Blakesley, *supra* note 7, at 43.

[39]*Id.* at 41-43.

[40]We have reviewed Richard's other arguments and conclude that they are without merit.