131 Nev., Advance Opinion 45

IN THE SUPREME COURT OF THE STATE OF NEVADA

| | |
|---|---|
| BEAU DAVIS,<br>Appellant,<br>vs.<br>ANDREA EWALEFO,<br>Respondent. | No. 63731<br><br>**FILED**<br><br>JUL 0 2 2015<br><br>TRACIE K. LINDEMAN<br>CLERK OF SUPREME COURT<br>BY S. Young<br>DEPUTY CLERK |

Petition for en banc reconsideration of a panel order affirming a district court's child custody decree. Eighth Judicial District Court, Family Court Division, Clark County; Kenneth E. Pollock, Judge.

*Petition for reconsideration granted; affirmed in part, reversed in part, and remanded.*

McFarling Law Group and Emily M. McFarling, Las Vegas, for Appellant.

Andrea Ewalefo, New Orleans, Louisiana, Pro Se.

BEFORE THE COURT EN BANC.

*OPINION*

By the Court, PICKERING, J.:

This is an appeal from a child custody decree. As stipulated, the decree gives the parents joint legal custody of their eight-year-old son, E.D., and awards the mother, respondent Andrea Ewalefo, primary physical custody. In dispute are the visitation rights of the father, appellant Beau Davis. The decree grants Davis unsupervised visitation

11/6/15: Corrected per letter to publishers. CT                    15-20176

but specifies that visitation cannot occur in Africa, where Davis lives and works; it also includes a *ne exeat* provision that forbids E.D. from traveling outside the United States except on court order or with both parents' consent. A divided three-judge panel questioned the lack of findings by the district court but nonetheless affirmed. *Davis v. Ewalefo*, Docket No. 63731 (Order of Affirmance, July 31, 2014) (2-1). Without specific findings to connect the child's best interests to the restrictions imposed, the travel and visitation restrictions cannot stand. We therefore grant en banc reconsideration and affirm in part, reverse in part, and remand.

I.

Ewalefo and Davis separated several years after E.D. was born. Although the couple did not marry, Davis acknowledged, and Ewalefo concedes, his paternity. Ewalefo's and E.D.'s residency made Nevada E.D.'s "home state" as defined in NRS 125A.085 when Davis filed this action. Thus, Nevada law applies to the district court's custody determination, including NRS 125.480, *Rico v. Rodriguez*, 121 Nev. 695, 701, 120 P.3d 812, 816 (2005), and, by extension, NRS 125.510 and NRS Chapters 125A through 125D. *See Druckman v. Ruscitti*, 130 Nev., Adv. Op. 50, 327 P.3d 511 (2014).

Ewalefo and Davis came to court in agreement that it was in E.D.'s best interest that they share joint legal custody, with Ewalefo exercising primary physical custody. They differed on visitation. The parents also disagreed on, but ultimately worked out details relating to, notice of visitation, holidays, Skype sessions, and other matters.

Davis lives and works in Africa, making frequent face-to-face and unscheduled visitation impossible. Before initiating this action, Davis worked with Ewalefo in an effort to establish reasonable visitation and

was met, the district court orally found, with "multiple instances of the Defendant [Ewalefo] finding reasons to alter or minimize contact."[1] In his complaint, Davis sought a decree awarding him up to four two-week blocks of unsupervised visitation per school year, to occur wherever E.D. is then attending school; in addition, he asked that E.D. be allowed to spend all but two weeks of his summers in Africa. Ewalefo agreed to Davis having unsupervised visitation but asked that it occur in the United States and be limited, initially, to three two-week blocks of time per year. Somewhat inconsistently, Ewalefo suggested as an appropriate condition of joint legal custody that, "If a trip is made overseas, the address(es) and telephone number(s) at which the minor child will reside must be provided within thirty (30) days prior to the minor child leaving the United States."

The facts elicited at the evidentiary hearing showed that, although a United States citizen, Davis has significant international ties, especially to Africa. Davis was born and raised in Nigeria to American missionaries, who now live in Texas. He graduated with a bachelor's of science degree from Texas A&M University, then went to work for the U.S. Department of Defense in its reconstruction efforts in Iraq. This was followed by project-management work for Texas A&M in the Democratic Republic of Congo (DRC), supporting construction and road improvement projects there. After Davis and Ewalefo separated, he married Marilena

---

[1] The dissent mentions the parties' difficulties with Skype and telephonic visitation as significant—and Davis's fault—but the district court rejected Ewalefo's arguments on this point, attributing what it dismissed as "the hiccups in the telephone or Skype visitation" as due in part to failures of technology, not Davis, then moving into its statement respecting the "multiple instances" of Ewalefo "finding reasons to alter or minimize contact."

Davis, a German national who had been a schoolmate of his growing up in Nigeria. Marilena now also works for Texas A&M on DRC project supervision. Davis owns a house in Texas, which he rents out.

Like Davis, Ewalefo is well-educated, with a bachelor's of science degree, and has international ties. Her father was born and raised in Nigeria, a country she visited as a child. When E.D. was three years old, he and his parents went to Kenya for vacation, where the family visited a game reserve. E.D. has also traveled to Europe with his mother. Ewalefo acknowledged that, at least before the formal custody proceedings began, she was agreeable to E.D. traveling overseas to visit Davis, so long as she was the boy's "traveling guardian," and at one point had been open to living overseas with Davis and E.D.

The DRC is and was at the time of the evidentiary hearing in the district court the subject of a U.S. State Department travel warning, cautioning against nonessential travel to that country. *See* http://travel.state.gov/content/passports/english/alertswarnings/democratic-republic-of-the-congo-travel-warning.html (last visited Mar. 26, 2015). Out of safety concerns, Davis did not propose that E.D. visit him and Marilena in the DRC but, rather, that his visitation occur in Rwanda or Uganda, countries that neighbor the DRC and have comparatively stable governments and resort cities with associated amenities and infrastructure. Neither Rwanda nor Uganda is currently or was at the time of the district court hearing the subject of a U.S. State Department warning similar to that in place for the DRC. *See* http://travel.state.gov/content/passports/english/alertswarnings.html (last visited Mar. 26, 2015); *but cf. infra* note 3. Davis's employer, Texas A&M, confirmed that, since his work for them in the DRC focused on scheduling,

budgets, and logistics, not hands-on construction, it would accommodate the family and allow Davis to work remotely from Rwanda or Uganda when E.D. visited. Davis testified to his and Marilena's plans for French and swimming lessons and other scheduled activities for E.D. when he visited.

Ewalefo objected to visitation in Rwanda and Uganda on the grounds that neither country is a signatory to the Hague Convention on the Civil Aspects of International Child Abduction,[2] a fact to which Davis stipulated and of which the district court took judicial notice. Ewalefo also cited safety concerns based on her Internet research concerning Rwanda's and Uganda's support in the late 1990s of rebel forces in the DRC, which remains unstable. She presented no expert proof on contemporary turmoil or threats, however, or citations to the historical research she undertook.[3]

---

[2]"The Convention provides that a child abducted in violation of rights of custody must be returned to the child's country of habitual residence, unless certain exceptions apply." *Abbott v. Abbott*, 560 U.S. 1, 5 (2010) (internal quotation marks omitted); *see also Lozano v. Montoya Alverez*, 572 U.S. ___, ___, 134 S. Ct. 1224, 1228-29 (2014) (discussing the purposes of the Hague Convention). Approximately 80 countries are signatories to the Convention. *See* United States Department of State, *U.S. Hague Convention Treaty Partners*, http://travel.state.gov/content/childabduction/english/country.html (follow "See list of Hague Convention Partner Countries" hyperlink) (last visited Mar. 31, 2015).

[3]Though not part of the record in this case, the State Department website suggests that events post-dating the evidentiary hearing in this case may legitimate Ewalefo's fears as to parts of Rwanda and Uganda. *See* http://travel.state.gov/content/passports/english/country/rwanda.html; http://travel.state.gov/content/passports/english/country/uganda.html (both last visited Mar. 26, 2015).

At the conclusion of the hearing, the district court denied Davis permission to have E.D. visit him in Africa. It also refused to grant summer visitation, instead limiting Davis's visitation to five two-week blocks of time per year, no closer than 60 days together. And, going further than either Davis or Ewalefo asked, the court forbade either parent from traveling with E.D. outside the United States or its territories, absent court order or signed consent. These restrictions carry no expiration date, and will last, unless the order is modified, until E.D. reaches the age of majority. In the district judge's words, "the child's going to have to wait til [he's] an adult and make [his] own decisions" about travel outside the United States.

In its ruling, the district court did not explain or make particularized findings as to why the international travel and visitation restrictions imposed were in the best interest of the child. Orally, the district judge stated, "We know that the law attempts to maximize the relationship between the child and both parents," *see* NRS 125.460, then said it would "hit" the "NRS 125.480 factors," even though "a lot them are not particularly applicable." The court found E.D., then almost seven, too young to have a creditable visitation preference; that Davis's and Ewalefo's conflicts were "minimal"; that neither Davis nor Ewalefo suffers mental or physical health problems; that E.D. is "normal, healthy [and] active"; that E.D. had traveled with his parents—to Africa, in fact—and "benefitted from . . . that travel"; that although E.D. has spent more time with his mother than his father, nothing suggests "that [E.D.'s] relationship with [his father] is anything other than a healthy, normal relationship"; that as for "Any history of parental abuse or neglect of the child, there's no evidence of any abuse or neglect"; and that there is "no

SUPREME COURT
OF
NEVADA

(O) 1947A

6

evidence ... of domestic violence," and "no evidence of a parental abduction" in this case. The court's only arguably negative finding as to either parent was that Ewalefo "has demonstrated a tendency towards controlling behavior," though it added "that may simply [be] because of the absence of [court] orders and being the primary parent stepping up."[4]

As for Africa, specifically Uganda and Rwanda, the district court made only these cryptic findings:

> In terms of the visitation in Africa . . . I should note that the world is a dangerous place as we've learned even in the United States terrorism can occur, that *the proposed countries [for visitation in Africa—Rwanda and Uganda] are not Hague signatories nor Hague compliant.*

(Emphasis added.) It did not offer any findings to justify its larger prohibition on international travel for E.D.

The district court's written custody decree tracks its oral ruling. It awards joint legal custody to Davis and Ewalefo, primary physical custody to Ewalefo, and up to five two-week periods of visitation a year to Davis. The decree states, without elaboration, that "[Davis's] request for visitation in Africa is denied." It also states that, "neither party shall take the minor child outside the United States or any of its territories or possessions absent a written agreement otherwise or upon further Order of the Court."

---

[4]The district court also stated that it found Ewalefo credible and, to the extent there were conflicts between her testimony and Davis's, resolved them in her favor.

## II.

The district court has "broad discretionary power" in determining child custody, *Hayes v. Gallacher*, 115 Nev. 1, 4, 972 P.2d 1138, 1140 (1999), including visitation. *See* NRS 125A.045 (defining a "child custody determination" as an order or decree that "provides for the legal custody, physical custody or visitation with respect to a child"); *Wallace v. Wallace*, 112 Nev. 1015, 1019, 922 P.2d 541, 543 (1996). Although this court reviews a district court's discretionary determinations deferentially, deference is not owed to legal error, *AA Primo Builders, LLC v. Washington*, 126 Nev. 578, 589, 245 P.3d 1190, 1197 (2010); *see Sims v. Sims*, 109 Nev. 1146, 1148-49, 865 P.2d 328, 330 (1993), or to findings so conclusory they may mask legal error, *Rivero v. Rivero*, 125 Nev. 410, 429, 216 P.3d 213, 226 (2009); *cf. Culbertson v. Culbertson*, 91 Nev. 230, 233-34, 533 P.2d 768, 770 (1975) (presuming that the district court properly exercised its discretion in determining the best interest of the child where the court made substantial factual findings). The decree in this case does not explicitly address the best interest of the child, E.D., nor does it include findings to support its implicit conclusion that E.D.'s best interest is served by forbidding visitation in Africa or travel outside the United States or its territories, absent a written agreement otherwise or court approval, until he becomes an adult. These deficiencies violate Nevada law, which requires express findings as to the best interest of the child in custody and visitation matters, NRS 125.480(4); NRS 125.510(5); NRS 125C.010(1), and they leave us in doubt whether "the district court's determination was made for appropriate reasons." *Rico*, 121 Nev. at 701, 120 P.3d at 816.

(O) 1947A

## A.

In making a child custody determination, "the sole consideration of the court is the best interest of the child." NRS 125.480(1). This is not achieved, as the district court seemed to believe, simply by processing the case through the factors that NRS 125.480(4) identifies as potentially relevant to a child's best interest and announcing a ruling. As the lead-in language to NRS 125.480(4) suggests, the list of factors in NRS 125.480(4) is nonexhaustive. *See* NRS 125.480(4) ("In determining the best interest of the child, the court shall consider and set forth its specific findings concerning, *among other things . . .*") (emphasis added); *Ellis v. Carucci*, 123 Nev. 145, 152, 161 P.3d 239, 243 (2007) (in determining the best interest of a child, "courts should look to the factors set forth in NRS 125.480(4) *as well as any other relevant considerations*") (emphasis added). Other factors, beyond those enumerated in NRS 125.480(4), may merit consideration.

Crucially, the decree or order must tie the child's best interest, as informed by specific, relevant findings respecting the NRS 125.480(4) and any other relevant factors, to the custody determination made. *Bluestein v. Bluestein*, 131 Nev., Adv. Op. 14, 345 P.3d 1044, 1049 (2015) (reversing and remanding a custody modification order for further proceedings because "the district court abused its discretion by failing to set forth specific findings that modifying the parties' custodial agreement to designate [mother] as primary physical custodian was in the best interest of the child"); *see* NRS 125.510(5) ("Any order awarding a party a limited right of custody to a child must define that right with sufficient particularity *to ensure* that the rights of the parties can be properly enforced and *that the best interest of the child is achieved.*") (emphasis

added); NRS 125C.010(1)(a) (identical, except it substitutes "a right of visitation of a minor child" for "a limited right of custody"); *Smith v. Smith*, 726 P.2d 423, 426 (Utah 1986) (deeming it "essential" that a custody determination set forth "the basic facts which show *why* that ultimate conclusion is justified").

Specific findings and an adequate explanation of the reasons for the custody determination "are crucial to enforce or modify a custody order and for appellate review." *Rivero*, 125 Nev. at 430, 216 P.3d at 227. Without them, this court cannot say with assurance that the custody determination was made for appropriate legal reasons. *See Sims*, 109 Nev. at 1148, 865 P.2d at 330; *Ivy v. Ivy*, 863 So. 2d 1010, 1013 (Miss. Ct. App. 2004) ("[M]eaningful appellate review . . . requires that the chancellor make on-the-record findings of fact as to issues relating to custody as well as some analysis of how these facts affected the ultimate custodial decision."); *Dixon v. Dixon*, 312 S.E.2d 669, 672 (N.C. Ct. App. 1984) ("[C]ustody orders are routinely vacated where the 'findings of fact' consist of mere conclusory statements. . . .") (citation omitted); *Keita v. Keita*, 823 N.W.2d 726, 730 (N.D. 2012) ("A district court's factual findings should be stated with sufficient specificity to enable this Court to understand the basis for its decision."). Yet, more is at stake than facilitating appellate review. A child custody determination, once made, controls the child's and the parents' lives until the child ages out or the decree is judicially modified. *Compare Rennels v. Rennels*, 127 Nev., Adv. Op. 49, 257 P.3d 396, 398 (2011) (holding that a stipulated order according nonparents visitation can only be modified "upon a showing of a substantial change in circumstances that affects [the] child's welfare such that it is in the child's best interest to modify the existing visitation

arrangement"), *and Ellis v. Carucci*, 123 Nev. at 150, 161 P.3d at 242 (to similar effect), *with* Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) § 303, adopted in Nevada as NRS 125A.445(1) (under the UCCJEA, a child custody determination carries nationwide effect; a court "shall recognize and enforce a child custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with the provisions of" the UCCJEA). A parent cannot reasonably be expected to show that "a substantial change in circumstances" as to the child's best interest warrants modification of an existing child custody determination unless the determination at least minimally explains the circumstances that account for its limitations and terms.

## B.

The decree in this case does not give a factual basis for denying Davis's request for visitation in Africa, much less for its ban on E.D. traveling outside the United States and its territories absent parental consent or court order. Although the best interest of the child is the controlling factor in child custody cases, *see* NRS 125.480(1), and maintaining "frequent associations and a continuing relationship with both parents after the parents have become separated or have dissolved their marriage" is Nevada's declared public policy, NRS 125.460(1), the decree effectively ensures that Davis and E.D. will never see one another on anything approaching Davis's home turf or more than infrequently, even though, unlike many cases where divorced or separated parents live half a world apart, Davis has the wherewithal and willingness to arrange for his son to travel to visit him (with supervision until he is old enough to travel alone). It also denies E.D. exposure to the rich and varied cultural

experiences both his parents had growing up and to the world beyond the borders of the United States that both Davis and Ewalefo embrace. Assuming Davis later moves to modify the decree, what explains the travel and visitation restrictions and how can he be expected to demonstrate that the circumstances that made the restrictions in E.D.'s best interest have substantially changed?

The decree does not address whether visitation in Africa would or would not be in E.D.'s best interest or explain why it is not in E.D.'s best interest for Davis to be able to exercise visitation, even one of the two-week visitation periods allotted him, outside the United States or its territories.[5] It also does not discuss parental fitness or other factors that could be informative in a custody determination. All the decree says is that "[Davis's] request for visitation in Africa is denied" and "neither party shall take the minor child outside the United States or any of its territories or possessions absent a written agreement otherwise or upon further Order of the Court."

"[T]here is a presumption that fit parents act in the best interests of their children." *Troxel v. Granville*, 530 U.S. 57, 68 (2000), and here, there is nothing to suggest that either parent is unfit or that "the child [is anything] other than . . . a normal, healthy [and] active" boy.

---

[5]The dissent hypothesizes that a summer in Africa with Davis and Marilena might not be in E.D.'s best interest because three months is too long for the boy, who was a month away from his seventh birthday when the decree was originally entered, to be away from Ewalefo. This may be but it is not what the decree states. The decree prohibits all visitation by Davis with E.D. outside the United States or its territories—even the two-week visitation periods it grants Davis—until E.D. reaches adulthood and does so without findings to support the restrictions.

And while the district court did discuss the factors listed in NRS 125.480, it did not explain *how* the factors supported the categorical prohibition it imposed. Instead, after opining that "the 125.480 factors, a lot of them really are not particularly applicable," the district court made observations that, if anything, supported Davis's request, including the fact that the child previously had traveled with his parents to Africa, the child "benefitted from some of that travel," and there were no concerns regarding parental abduction, abuse, neglect, or mental health problems. *See also* Linda D. Elrod, *Child Custody Practice & Procedure* § 6:15 (2014) (noting that "[j]udges, lawyers, and social scientists feel that, in most instances, children should be encouraged to have as close and as normal a parent-child relationship as possible with both parents" and from this it follows that, "[a]bsent extraordinary circumstances, a nonresidential parent should be able to determine the place and manner of visitation" and that "[a]ny restrictions should be reasonable, and not infringe on other constitutional rights").

Here, none of the district court's oral or written observations explain *why* the district court ruled as it did. Instead, the only apparent basis for the district court's denial of Davis's request for visitation in Africa was because Rwanda and Uganda are neither "Hague signatories nor Hague compliant." But unless a credible threat exists that a parent would abduct or refuse to return a child, courts have "decline[d] to adopt a bright-line rule prohibiting out-of-country visitation by a parent whose country has not adopted the Hague Convention or executed an extradition treaty with the United States." *Abouzahr v. Matera-Abouzahr*, 824 A.2d 268, 281 (N.J. Super. Ct. App. Div. 2003); *see also Long v. Ardestani*, 624 N.W.2d 405, 417 (Wis. Ct. App. 2001) (finding no cases that "even hint" at

a rule that provides, "as a matter of law that a parent . . . may not take a child to a country that is not a signatory to the Hague Convention if the other parent objects"). Here, the district court expressly found that both parents are fit, the "level of conflict between the parents is minimal at best," and there is no threat of abduction, making the court's mention of Rwanda's and Uganda's Hague-signatory status a cipher, not a reason for the limitations imposed. *See In re Rix*, 20 A.3d 326, 328-29 (N.H. 2011) (affirming order allowing child to travel to India with his father over mother's objection that India is not a signatory to the Hague Convention where the trial court noted that it had heard "no evidence that father will not return with the child").

This is not to say that a district court may not, in a proper case, prohibit visitation in a non-Hague signatory country or impose limitations on international travel, or travel to dangerous parts of the world, if the best interest of the child demands. *See, e.g., Katare v. Katare*, 283 P.3d 546, 552 (Wash. 2012) (upholding travel restrictions where there was evidence that the father presented a serious risk of absconding with the children to India). But before doing so, the court must make findings that support its restrictions and, if the basis for the restriction is fear of abduction or concealment, consider alternatives offered by law. Nevada has adopted the Uniform Child Abduction Prevention Act, NRS Chapter 125D, to address such alternatives. Either at the request of a party or its own motion, a district court "may order abduction prevention measures in a child custody proceeding if the court finds that the evidence establishes a credible risk of abduction of a child." NRS 125D.150(1). This Act articulates the factors a district court should consider in making such a determination, NRS 125D.180, and offers a series of graduated

restrictions, ranging from providing the other parent with detailed itineraries for the child, to the posting of a bond to ensure the child's return, to complete prohibition on travel outside the United States. NRS 125D.190. But, by law, "[t]he fact that a parent has significant commitments in a foreign country does not create a presumption that the parent poses an imminent risk of wrongfully removing or concealing the child." NRS 125.510(8)(b).

The district court's cursory finding of "no evidence of abduction" suggests, as the record does, that it found that Davis, with his strong ties to the United States government and Texas A&M, did not pose a credible abduction threat. But if risk of abduction does not justify the travel and visitation restrictions, some other basis must be established as a reason for imposing them. The fact that "the world is a dangerous place" is not enough.

We therefore reverse and remand as to the visitation and travel restrictions imposed in the decree. On remand, the district court shall reopen the proceedings and take evidence and make findings concerning whether E.D. may safely visit his father and stepmother in Rwanda or Uganda, whether doing so is in his best interest, and, if necessary, whether abduction prevention measures are appropriate. *See supra* note 3. Contrary to the dissent's suggestion, we do not mandate that such visitation occur, only that, if it is to be prohibited, findings be made to support the prohibition. As for the ban on international travel by E.D. until he reaches the age of 18, no evidence appears in the record to legitimate such a categorical ban. *See, e.g., In re Marriage of Stern*, 2015

WL 568584, *2 (Iowa Ct. App. 2015) (pending publication decision) (reversing ban on international travel until a child reaches 16 years of age and noting, "Our case law . . . does not recognize any limitation on visitation rights solely because one of the parents resides outside the borders of Iowa or the United States."). Pending further proceedings on remand consistent with this order, we leave in place the temporal visitation provisions in the decree and the travel restrictions included in the temporary visitation schedule agreed to by the parties, subject to modification by the district court to comport with current circumstances. We do not disturb the panel's affirmance of the district court's resolution of the parties' dispute as to child support and all other issues in the case.

_____ , J.
Pickering

We concur:

_____ , C.J.
Hardesty

_____ , J.
Cherry

_____ , J.
Douglas

_____ , J.
Gibbons

PARRAGUIRRE, J., with whom SAITTA, J., agrees, dissenting:

I disagree with the majority's conclusion that the district court abused its discretion by denying Davis's request for prolonged visitation in Africa. Accordingly, I believe that this court made the proper decision in affirming the district court's custody decree and I would deny en banc reconsideration.

The majority overlooks key facts considered by the district court in denying Davis's request to have E.D. for extended periods of time in Africa. At the time of the evidentiary hearing in 2013, E.D. was only six years old, and for the majority of E.D.'s life, Davis had worked overseas. As a result, Davis was provided with a few two-week visitation periods each year. But, Davis actually only spent on average a total of three weeks per year with E.D. Additionally, Davis failed to visit E.D. for an entire year between July 2011 and August 2012. Evidence was also offered that while Davis was previously allowed specific telephone and Skype visitation with E.D., Davis failed to exercise about 50 percent of that visitation. Further, Davis's own wife Marilena, with whom E.D. would reside in Africa, testified that she had only met E.D. on four occasions.

As a result, Ewalefo testified that she did not believe E.D. would be comfortable going from seeing Davis for two weeks at a time to spending three months with Davis and Marilena. In fact, Ewalefo argued that it may negatively affect E.D.'s emotional and mental development to suddenly be unable to see his mother for a three-month period of time, when she testified that she is the parent who has spent 96 percent of the time each year with him.

Ewalefo further testified about concerns she had with Davis's parental abilities. For example, she testified about an instance during Davis's visitation when E.D. was 15 months old and Davis left E.D. overnight with a neighbor, who resided with a known drug user, while Davis went out drinking; and another instance when Davis took E.D., then four years old, to one of Davis's medical appointments and left him in the waiting room hiding under a coffee table while Davis met with the doctor because, as Davis informed her, he never thought to take E.D. into the back office with him. Ewalefo also testified that she had concerns over her ability to maintain communication with E.D. while he was in Davis's custody because she had previously had trouble speaking with E.D. when he was with Davis. The district court concluded that Ewalefo's testimony was more credible than Davis's testimony.

The majority recognizes the well-established rule that this court will not overturn a custody decision absent a clear abuse of discretion, *Wallace v. Wallace*, 112 Nev. 1015, 1019, 922 P.2d 541, 543 (1996), but then determines that the district court's failure to include express factual findings in the custody decree prevents adequate appellate review because without those express findings there is insufficient support for the district court's decision. While I agree that written factual findings facilitate appellate review, because the record as a whole in this case includes substantial evidence supporting the district court's decision, reversal is unwarranted. *See Williams v. Williams*, 120 Nev. 559, 566, 97 P.3d 1124, 1129 (2004) (recognizing that "[r]ulings supported by substantial evidence will not be disturbed on appeal"). At the evidentiary hearing, the district court specifically considered and made findings on the record regarding each of the NRS 125.480(4) best interest of the child

factors, recognizing that because of Davis's minimal contact with E.D. there was limited evidence regarding certain factors. Accordingly, the district court's consideration of those factors at the evidentiary hearing meets NRS 125.480(4)'s requirement that the court "consider and set forth its specific findings" regarding the factors listed. Further, faulting the district court for its inability to better address some of those factors because of their inapplicability to the case or a lack of evidence presented by the parties would be unreasonable.

Additionally, a lack of express factual findings in the custody decree does not enable this court to reweigh the evidence presented at the two-day evidentiary hearing and substitute its judgment for that of the district court, as the majority purports to do. *See Schwartz v. Schwartz*, 126 Nev. 87, 91, 225 P.3d 1273, 1276 (2010) (explaining that under an abuse of discretion standard, "we will not substitute our judgment for that of the district court"). We have repeatedly held that the district court is in the best position to hear and decide the facts and determine witness credibility. *In re J.D.N.*, 128 Nev., Adv. Op. 44, 283 P.3d 842, 852 (2012) (explaining that "the family division of the district court is in a better position to weigh the credibility of witnesses"); *see also Schwartz*, 126 Nev. at 91, 225 P.3d at 1276 (providing that the district court is "in the best position to hear and decide the facts of this case"). Here, the district court recognized that "the child has lived primarily almost to the point of exclusively with [Ewalefo]" and that "[Ewalefo] is more credible" than Davis. This court should not then reweigh the evidence considered or the testimony of the witnesses.

While the majority places great emphasis on the fact that the district court's custody decree may prevent E.D. from traveling

internationally until he turns 18,[1] the majority overlooks the fact that the district court was tasked with the job of determining if it was in the best interest of the then-six-year-old child to spend three months a year in a foreign country with a parent with whom he has had limited contact. *See Rico v. Rodriguez*, 121 Nev. 695, 704, 120 P.3d 812, 818 (2005) (recognizing that the district court determines what is in a child's best interest when it serves as a tiebreaker in a dispute between parents). Although finality in custody decisions is important because it promotes the stability necessary to support the developmental and emotional needs of a child, *Ellis v. Carucci*, 123 Nev. 145, 149, 161 P.3d 239, 242 (2007), the district court cannot focus on potential future circumstances at the expense of the situation currently before it when making a custody decision.

Additionally, under the order the parties remain free to agree to E.D.'s international visitation and travel, which seems likely to occur as the district court concluded that the parties had a low level of conflict and Ewalefo testified that as E.D. gets older, it may become more appropriate for him to spend extended periods of time with Davis. Moreover, the order does not prevent either party from seeking a modification as the child ages and the circumstances change. *See Ellis*, 123 Nev. at 150, 161 P.3d at 242 (explaining that a modification of a primary physical custody arrangement

---

[1]The majority is concerned with the district court restricting the parties from traveling internationally with E.D. when neither party requested such a restriction, but it appears that the district court imposed that restriction in response to Davis's testimony whereby he was concerned that Ewalefo had traveled with E.D. outside the United States without informing him and in response to Davis's implication that any international travel and visitation restrictions should apply equally.

is appropriate when there is a substantial change in the circumstances and the modification serves the child's best interest).

Because the panel's decision was correct and reversing and remanding this matter will only serve to unnecessarily delay the custody dispute, I would deny Davis's petition for en banc reconsideration. *See* NRAP 40A(a) (describing the grounds for en banc reconsideration). Thus, I respectfully dissent.

_____, J.
Parraguirre

I concur:

_____, J.
Saitta